**Lisa MANN, Plaintiff,**

v.

**UNIVERSITY OF CINCINNATI,
et al., Defendants.**

**No. C–1–92–852.**

United States District Court,
S.D. Ohio, W.D.

June 24, 1993.

Robert Hugh Gutzwiller, Cincinnati, OH, for plaintiff.

Frank Hale Stewart, Taft, Stettinius & Hollister, Cincinnati, OH, for defendants.

## ORDER

STEINBERG, United States Magistrate Judge.

This case is before the Court upon plaintiff Lisa Mann's motions for protective order

(Doc. 5) and for sanctions due to the unauthorized release of Ms. Mann's medical records (Doc. 8). These motions call into question the conduct of defense counsel who, knowing that Ms. Mann objected to their review of her medical records due to the private information contained therein and that her attorney was studying the question whether to release relevant medical records, nevertheless issued a subpoena duces tecum for all of Ms. Mann's medical records, regardless of their relevancy.. This subpoena was issued on only one week's notice to Ms. Mann's attorney and was accompanied by an ex parte letter instructing the custodian to release the records prior to the date set forth in the subpoena.

Two business days after the subpoena was issued, defense counsel obtained Ms. Mann's entire medical file without her knowledge and copied several pages. The file included extremely private information she provided years before the events in this case, which is irrelevant to the issues herein. Defense counsel also obtained copies of certain records. In response to the instant motions, defense counsel showed no remorse. Surprisingly, they claimed Ms. Mann enjoyed no doctor-patient privilege, that her privacy rights were not invaded, and that it was their common practice to obtain medical records prior to the subpoena date without notice to opposing counsel or the patient. Below we explain why such conduct is improper and impose sanctions.

## FACTUAL BACKGROUND

On October 29, 1992, Ms. Mann filed the instant action, alleging that University of Cincinnati academic employees, defendants Robert Monast and Jon Clemens, sexually harassed her and improperly took unfavorable academic actions against her in violation of her Fourteenth Amendment rights to equal protection of the law and to be free from arbitrary, capricious, and unreasonable academic decisions and that defendant University of Cincinnati failed to take appropriate action to correct these improprieties, all in violation of 42 U.S.C. § 1983. She also alleged that she was denied her right to an education at the University of Cincinnati in violation of 20 U.S.C. § 1681. The aforesaid conduct allegedly took place between September 1990 and July 1991. Among other damages, Ms. Mann alleges she suffered emotional distress, including destruction of her self-esteem and emotional trauma.

During the course of the alleged sexual harassment, on May 28, 1991, Ms. Mann wrote "to whom it may concern," and forwarded her letter to the President of the University of Cincinnati. (Df. Ex. B). The letter stated that she was withdrawing from the University because "I have suffered a major emotional crisis.... The Student Health Clinic should be able to provide you with a diagnosis by Dr. A___ (sic), he's a foreign doctor and I cannot read his writing. He claimed I suffered from 'anxiety' and gave me medicine. I ... decided not to take these drugs and deal with the problem that was *seriously* disturbing me. Also I went to a dermatologist at this time because for the first time in my life I suffered from a complexion problem." Id. (Emphasis in original). This letter was referred to a University of Cincinnati Assistant General Counsel (University counsel), who investigated the matter and consulted with outside counsel, a member of a private Cincinnati law firm (defendants' attorney).

University counsel testified at the hearing that she has managed this case since the complaint was filed in October 1992 and has coordinated the defense with defendants' attorney. In response to defendants' interrogatories, Ms. Mann stated that she told Mr. Clemens in early 1991 that she "had been diagnosed as under stress and had medication." (Doc. 8, Ex. A, plaintiff's answer to interrogatory 9(dd)). She stated that "I continue to suffer mental pain because of the indignities suffered at the hands of Defendants, and remain distressed and outraged at Mr. Monast and Mr. Clemens." (Id., plaintiff's answer to interrogatory 9(ff)). She claimed damages for "emotional pain, suffering, and outrage, shock and degradation of and to person, loss of respect and confidence in education and educational process, and despair at being exposed to such process ... "[l]oss of enjoyment of life due to psychologi-

cal trauma ... and for anxiety." (Id., plaintiff's answer to interrogatory 17).

On March 2, 1993, during Ms. Mann's deposition, defendants' attorney presented her with releases for her medical records in order to study them in preparation for further deposition questions regarding Ms. Mann's emotional distress claim. Ms. Mann refused to sign the releases believing her medical records contained private information; however, her attorney stated he would study the matter further.

On March 12, 1993, defendants' attorney wrote plaintiff's attorney:

> Upon the postponement of Ms. Mann's deposition on March 2 because of her inability to continue, we requested that she sign medical releases to enable us to obtain her medical records from Doctors Hani Abdulla and Elmore A. Kindel, Jr. We still have not received the signed releases. If we have not received the releases by March 19, we will subpoena the records. We would much prefer, however, to have Ms. Mann's cooperation in this matter....

(Df. Ex. C). Defendants' attorney stated at the hearing that she was aware that Ms. Mann had previously obtained medical treatment related to a fire and to an automobile accident. Defendants' attorney was searching for this information and any other information about "previous life stressors" as well as any contemporaneous reports by Ms. Mann of sexual harassment.

On March 17, 1993, plaintiff's attorney wrote defendants' attorney: "In reference to your letter of March 12, 1993, requesting medical releases ... I am currently considering these requests." (Df. Ex. D).

On April 1, 1993, plaintiff's attorney advised defendants' attorney orally that he was still studying the matter of medical releases and would advise her of his position on April 9, 1993. Defendants' attorney responded that she would subpoena the medical records. Defendants' attorney and University counsel then agreed to issue a subpoena for the medical records.

On Friday, April 2, 1993, defendants' attorney caused to be prepared an AO Form 88 Civil Subpoena to the Custodian of Records for the University of Cincinnati Student Health Services for the "complete medical file of Lisa Mann" to be produced in one week, on April 9, 1993. (Pl. Ex. 1). Defendants' attorney signed the Student Health Services subpoena as the issuing officer. She also subpoenaed Dr. Kindel's medical records for Ms. Mann and may have subpoenaed other records. Defendants' attorney did not limit the subpoenas to the time period or evidence relevant to this case, even though she was aware that Ms. Mann felt the records contained confidential information and had refused to sign a medical release.

On April 2, 1993, a copy of the subpoena was hand delivered to the Student Health Services along with a letter from a paralegal working for defendants' attorney. The letter advised the Student Health Services that defendants' law firm was the University's legal representative. It continued in pertinent part:

> As an alternative to your appearance at our firm on April 9th with the documents listed in the subpoena, we would be willing to have you locate and produce copies of those documents for us. We agree to reimburse you for reasonable copy charges but request that they be provided to us *prior* to the subpoena date. If you choose this alternative, please contact me at 381–2838 with the dollar amount that you would be charging us for those copies. We will arrange for pick-up of those documents.

(Pl.Ex. 2) (emphasis in original). Defendants' attorney was aware that this letter had been delivered to the Student Health Services.

The subpoena, in form language drafted by the Administrative Office of U.S. Courts on the reverse side, advises the recipient that "[a] person commanded to produce and permit inspection and copying of designated ... documents ... need not appear in person at the place of inspection unless commanded to appear for deposition, hearing or trial." (Id.). Thus, the recipient was made aware that she could produce the records on the date in question rather than appearing in person at the place set forth in the subpoena. The form language, however, does not autho-

rize the recipient to submit the subpoenaed documents prior to the production date.

On the same date, April 2, 1993, a copy of the subpoena was hand delivered to plaintiff's attorney's office; however, he was not given a copy of the letter instructing the subpoena recipient to release the records prior to the production date. Plaintiff's attorney did not see the subpoena until Monday, April 5, 1993.

Catherine Castillo, Business Manager of the Student Health Services, received the subpoena and the letter on Monday, April 5, 1993. She contacted the University of Cincinnati Legal Department and spoke to University counsel to determine how to respond to the subpoena. Following a discussion with defendants' attorney, University counsel advised Ms. Castillo to produce the records as requested prior to the date set forth in the subpoena. She did not instruct Ms. Castillo to inform Ms. Mann or her attorney that the records were being released before the subpoena date, nor did she inform them herself. University counsel testified that she saw no conflict in her dual roles of having the subpoena issued and then counseling the recipient to respond to it before the production date.

On Tuesday, April 6, 1993, without any notice to Ms. Mann or her attorney, defendants' attorney travelled to the University of Cincinnati Student Health Services and reviewed Ms. Mann's complete medical file. She copied four pages of the file and took them with her. She also obtained Dr. Kindel's medical records that same day, apparently by instructing him to produce them before the subpoena date. That afternoon, sometime after defendants' attorney had reviewed the medical records and obtained copies, plaintiff's attorney telephoned Ms. Castillo and told her Ms. Mann objected to the release of her medical records and he would be filing a motion with this Court to have the subpoena quashed.

Plaintiff's attorney's action to prevent disclosure of the medical records came only two business days after his office received a copy of the subpoena and one day after he had personally seen it. Ms. Castillo testified at the hearing that she did not advise plaintiff's attorney that defendants' attorney had already seen the records, because she "assumed he already knew." Ms. Castillo reported this incident to University counsel and told her that plaintiff's attorney had not been informed that the records had already been reviewed and copied.

Plaintiff's attorney, having no knowledge that the medical records had already been reviewed, filed a motion for protective order and to quash the subpoena on Wednesday, April 7, 1993, only three business days after the subpoena had been issued. He requested the Magistrate Judge to conduct a conference to attempt to resolve the privacy issue prior to the production date of April 9, 1993. Defendants' attorney was contacted and agreed to participate in a telephone conference with the Magistrate Judge on April 8, 1993, regarding the question of whether Ms. Mann's medical records should be produced on April 9, 1993.

On the morning of Thursday, April 8, 1993, defendants' attorney filed a memorandum opposing the motion to quash, wherein she stated that she had examined the Student Health Services' medical records and had obtained Dr. Kindel's medical records. She did not state that she had copied and retained Student Health Services records. Although defendants' attorney properly filed this pleading with the Clerk, the Clerk did not deliver it to the Magistrate Judge prior to the telephone conference.

During the telephone conference, plaintiff's attorney described the background of the dispute. He stated that he had no objection to discovery of medical records reflecting Ms. Mann's dermatological treatment; mental treatment, if any; or physical injury treatment likely to produce emotional distress. He agreed that medical records regarding Ms. Mann's treatment for injuries suffered in an automobile accident and a fire were discoverable. However, he objected to records relating to Ms. Mann's gynecological treatment, which he felt were very private and irrelevant. He related that the records contained information so private that Ms. Mann had not authorized him to review them. During the conversation, defendants' attor-

ney did not advise the Court that she had already inspected the records in question. Ms. Mann and her attorney were still unaware her medical records had been examined.

Because it is possible that certain gynecological treatment during the relevant period of time could have resulted in emotional distress, the Magistrate Judge determined that the medical records should be reviewed *in camera* to weigh Ms. Mann's privilege and privacy right to nondisclosure against the possible relevancy the records had to this case. The Magistrate Judge ordered the subpoena quashed and required Ms. Mann to review her University of Cincinnati medical records. Ms. Mann was ordered to produce all such records to which she had no objection on Wednesday, April 14, 1993. Any records to which she objected were to be submitted to the Court *in camera,* sealed, no later than April 19, 1993. (Doc. 7).

Ms. Mann then travelled to the University of Cincinnati Hospital, where certain of her medical records were on file, and authorized the Hospital to produce a copy of them under seal to the Court. She also travelled to the Student Health Services and obtained a copy of her records to review pursuant to the Court's instructions. There she learned for the first time that the Student Health Services had already permitted defendants' attorney to review her records. On April 12, 1993, Ms. Mann, who was very upset at this news, delivered to the Court a copy of her Student Health Services file and advised the Magistrate Judge's secretary that defense counsel had already examined it without her permission. The Magistrate Judge contacted both counsel that same day and verified that defendants' attorney had indeed reviewed the Student Health Services file. The Court was still not advised that certain records had been copied. Plaintiff's attorney stated he would pursue a sanctions motion, which he filed on April 21, 1993.

In a pre-hearing brief, defendants' attorney claimed, incorrectly, that FED.R.CIV.P. 45 did not require her to serve a copy of the subpoena on plaintiff's counsel. (Doc. 10, p. 3). She also claimed she was entitled to examine all of Ms. Mann's medical and psychological records, "dating even back to her childhood if necessary, to discover whether other traumatic events in her life could have caused all or part of the psychological distress she claims she suffered." (Id., p. 4). No citation of authority, as required by this Court's rules, supported this claim. She also claimed the Ohio physician-patient privilege applied to Ms. Mann's medical records and that Ms. Mann had waived it by filing this case. (Id. at 4–5).

A hearing was conducted on the pending motions on May 20, 1993. At the hearing, while defendants' now admitted Rule 45 required them to serve a copy of the subpoena on plaintiff's attorney, they also took the position that there was no reason to issue a subpoena. They claimed the Ohio law of physician-patient privilege did not apply because this was a federal case; that there was no physician-patient privilege recognized in the federal court; and that, because the records belonged to their client, the University, they were entitled to review them. They also asserted, without citing authority, that Rule 45 permitted inspection of records prior to the production date set forth in the subpoena. They stated, surprisingly, that permitting inspection of medical records prior to the subpoena production date was the University's *normal practice.*

## THE FEDERAL COURTS RECOGNIZE A PATIENT'S CONSTITUTIONAL PRIVACY RIGHT REGARDING HER MEDICAL RECORDS

■ Almost thirty years ago, the United States Supreme Court recognized an individual's constitutional right to privacy. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Twenty years ago, the Supreme Court recognized that the right of privacy is founded in the Fourteenth Amendment's concept of personal liberty, and held that it encompassed a woman's decision whether or not to terminate her pregnancy. *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973).

As long as sixteen years ago, the Supreme Court specifically recognized the individual's constitutional right to privacy in the context

of a doctor-patient relationship. *See Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In that case, the district court had determined that the doctor-patient relationship is one of the zones of privacy accorded constitutional protection and had enjoined enforcement of portions of the New York State Controlled Substances Act of 1972 regarding patient identification. *Id.* at 596, 97 S.Ct. at 875. The Supreme Court did not disagree with that portion of the District Court's holding which recognized a constitutional privacy right in the doctor-patient relationship. It held that one type of privacy interest protected by the Fourteenth Amendment "is the individual interest in avoiding disclosure of personal matters ..." *Id.* at 599, 97 S.Ct. at 876, citing *Griswold,* 381 U.S. at 483, 85 S.Ct. at 1681; *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *California Bankers Assn. v. Shultz,* 416 U.S. 21, 79, 94 S.Ct. 1494, 1526, 39 L.Ed.2d 812 (1974) (Douglas, J., dissenting); id., at 78, 94 S.Ct. at 1525 (Powell, J. concurring).

The Court determined that the privacy right was not absolute; i.e., it did not prevent disclosure of private medical information in all cases. Instead, the Court applied a balancing test. It ruled that the New York program had adequate disclosure safeguards so that it did not pose a sufficiently grievous threat to either of two privacy interests to establish a constitutional violation: 1) the individual's interest in nondisclosure of private information, and 2) his/her interest in making decisions vital to his/her health care. Id., 429 U.S. at 600, 97 S.Ct. at 877.

The Sixth Circuit Court of Appeals has, for more than a decade, recognized a constitutional right of privacy in medical records. In cases where the Sixth Circuit approved the release of medical records to a federal grand jury and to the National Institute for Occupational Safety and Health respectively, it recognized the constitutional privacy rights of patients. *See In re Zuniga,* 714 F.2d 632, 642 (6th Cir), *cert. denied, Zuniga v. United States,* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983); *General Motors Corp. v. Director of the National Institute for Occupational Safety and Health,* 636 F.2d 163, 166 (6th Cir.1980), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981) (hereafter *G.M.C. v. N.I.O.S.H).* The Sixth Circuit has clearly stated that, with respect to their medical records, "[i]t is firmly established that individuals have a constitutionally protected right to privacy." *Gutierrez v. Lynch,* 826 F.2d 1534, 1539 (6th Cir.1987).[1] The Sixth Circuit applies a balancing test, as did the Supreme Court, considering the potential conflict between the asserted right of access to medical records and the patient's right to privacy. Id.

Both of the Ohio District Courts have recognized that the Constitution protects private persons from disclosure of private information, including medical records. *See Doe v. City of Cleveland,* 788 F.Supp. 979, 985 (N.D.Ohio 1991); *Fisher v. City of Cincinnati,* 753 F.Supp. 692, 694 (S.D.Ohio 1990) (Rubin, J.).[2] These courts have also applied a balancing test to determine whether disclosure of medical records is justified. *Fisher,* 753 F.Supp. at 694.

Although this area of the law has been developing since the 1960's, and the federal courts continue to refine the application of the constitutional right to privacy in medical records, in the year 1993 a competent attorney practicing before this Court and seeking

---

1. Gutierrez included a cause of action based on violation of the plaintiff's right to privacy by a city ordinance that required employees on sick leave for more than thirty days to provide the city with medical information. While recognizing the individual's right of privacy in his/her medical records, the Court held that the city's legitimate request for medical information did not invade the plaintiff's right to privacy. *Id.* at 1539.

2. Other cases that have recognized a constitutional right to privacy regarding medical information include *Inmates of New York State with Human Immune Deficiency Virus v. Cuomo,* No. 90–CV–252, 1991 WL 16032 (N.D.N.Y. Feb. 7, 1991); *Rodriguez v. Coughlin,* No. CIV–87–1577E, 1989 WL 59607 (W.D.N.Y. June 5, 1989); *Doe v. Meachum,* 126 F.R.D. 452 (D.Conn.1989); *Plowman v. United States Dep't of Army,* 698 F.Supp. 627, 633 and n. 22 (E.D.Va.1988); *Doe v. Coughlin,* 697 F.Supp. 1234, 1237 (N.D.N.Y. 1988); and *Woods v. White,* 689 F.Supp. 874, 876 (W.D.Wis.1988), *aff'd,* 899 F.2d 17 (7th Cir. 1990).

to obtain a patient's medical records should have been aware of the aforementioned case law in the Supreme Court, the Sixth Circuit Court of Appeals, and the Ohio District Courts. The University of Cincinnati, through its counsel, should have been aware of the federal constitutional privacy right in medical records. It should also have known that medical records are privileged under Ohio law. *See* Ohio Rev.Code § 2317.-02(B)(1). Therefore, the University, through its counsel, should have been aware that it was not free to disclose medical records, even to other University departments or to their attorneys, in the absence of a release by the patient or a valid court order.

## THE FEDERAL COURTS HAVE ALSO RECOGNIZED A FEDERAL COMMON LAW PRIVILEGE IN THE DOCTOR–PATIENT RELATIONSHIP

■ Defendants argue that the Sixth Circuit has refused to recognize a doctor-patient[3] privilege in federal cases. This overstates the case law. The issue of federal doctor-patient privilege, as applicable to facts similar to those in this case, has to our knowledge not been reviewed by the Sixth Circuit or this Court, most likely because no attorney has been bold enough to challenge a patient's claim that her medical records were privileged. Furthermore, in light of the protections afforded by the patient's constitutional right to privacy, it has not been necessary to apply a common law evidentiary privilege.

In *G.M.C.*, the Sixth Circuit held that

[t]he common law did not recognize a physician-patient privilege at all. Neither has Congress codified the concept in a federal statute. A decision in this case based on considerations of the physician-patient relationship would, in effect, expand the scope of the 'federal common law.' This we decline to do.

636 F.2d at 165 (citations omitted). This statement means nothing more than what it says—in that particular case, the Sixth Circuit declined to expand the scope of federal common law to apply a physician-patient privilege. *G.M.C.* did not involve a patient's assertion of privilege. Rather, it involved a refusal by General Motors Corporation to produce the medical records of a group of its employees pursuant to a N.I.O.S.H. subpoena issued in connection with a health hazard investigation. The Sixth Circuit acknowledged the employees' constitutional right to privacy and found that it would not be violated if the medical records sought were released to N.I.O.S.H. pursuant to a protective order which safeguarded against improper disclosure. *Id.* at 166. Thus, there was no need to apply a common law privilege.

Another panel of the Sixth Circuit has broadly stated in dicta that "the federal courts do not recognize a federal physician-patient privilege." *Hancock v. Dodson,* 958 F.2d 1367, 1373 (6th Cir.1992). *Hancock* involved a § 1983 civil rights claim against police officers who allegedly used excessive force in arresting the plaintiff. At issue was the plaintiff's objection to his treating doctor's testimony regarding plaintiff's alleged injuries. After making the statement quoted above, the Sixth Circuit went on to state that, if the privilege had applied, it would not have prevented the doctor's testimony in any event because Hancock waived his privilege by executing a release of his medical records to opposing counsel. Thus, *Hancock* was also a case where there was no need to apply a doctor-patient privilege.

Where the Sixth Circuit has perceived a need to apply the privilege, it has done so. In *Zuniga,* 714 F.2d at 638–39, the Sixth Circuit recognized and applied the psychotherapist-patient privilege. The Supreme Court denied certiorari. *Zuniga v. United States,* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983). The psychotherapist-patient privilege is, if anything, an extension of the physician-patient privilege.[4] The

---

**3.** We use the term "doctor-patient" to describe a privilege that is more extensive than the physician-patient privilege. Included in our use of the term "doctor" is the psychiatrist, the psychologist, and the psychotherapist.

**4.** Ohio recognized the physician-patient privilege by statute in 1953. Ohio Rev.Code § 2317.02 (HISTORY) (Page Supplement 1993). It was not until 1972 that the Ohio Legislature recognized the psychologist-patient privilege. Ohio Rev.

Sixth Circuit made no attempt to "define the appropriate perimeters of the privilege. Just as the recognition of privileges must be undertaken on a case-by-case basis, so too must the scope of the privilege be considered." 714 F.2d at 639 (citations omitted). The privilege, like the constitutional privacy right, is not absolute. "[T]he appropriate scope of a privilege, like the propriety of the privilege itself, is determined by balancing the interests protected by shielding the evidence sought with those advanced by disclosure." *Id.* at 639–42.

We believe the Sixth Circuit would recognize that a doctor-patient privilege exists in the instant case, unless it found it unnecessary to apply it because the records are already protected by Ms. Mann's substantive constitutional privacy right. Although federal and not Ohio law controls, "the privilege as developed by the states is [not] irrelevant." *United States v. Gillock,* 445 U.S. 360, 368 n. 8, 100 S.Ct. 1185, 1191 n. 8, 63 L.Ed.2d 454 (1980). The Supreme Court "has taken note of state privilege laws in determining whether to retain them in the federal system." *Id.* Because the Sixth Circuit has found the doctor-patient privilege does not necessarily prevent the disclosure of relevant information, and because it promotes very important privacy and health interests, *see Zuniga,* 714 F.2d at 639, citing *Trammel v. United States,* 445 U.S. 40, 52, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980), there is little reason to deny its application to the facts in this case. We invite defendants to appeal this ruling so that the Sixth Circuit may speak with specificity regarding the constitutional privacy right and the doctor-patient privilege associated with medical records under the circumstances existing in this case.

### MANY OF THE MEDICAL RECORDS AT ISSUE IN THIS CASE ARE PROTECTED FROM DISCOVERY BY MS. MANN'S PRIVACY RIGHT AND DOCTOR–PATIENT PRIVILEGE

■ The Court has now completed its *in camera* review of the medical records from University Hospital and the Student Health Services. These records contain the most private medical and social information a woman possesses. The Student Health Services file, which defendants' attorney has already reviewed, includes Ms. Mann's answers, made in 1987, to the following inquiries:

History of possible diseases;

Family history of diseases;

Menstrual history, including onset of first menstrual period;

How often you menstruate, number of days, pain, etc;

Have you ever had a discharge from your nipples?;

Age at time of first intercourse;

Date of last intercourse;

Number of sexual partners ever;

Number in past 12 mos.;

Number in past 1 month;

What method of birth control are you using now?;

List all types of contraception in the past;

Total number of years on the pill;

Any side effects;

Any previous pelvic surgery;

Have you ever had a pelvic infection?;

Have you ever had a vaginal infection? Yeast___, trich___, gonorrhea___, herpes___, volvar warts___;

Any known problems found on previous pelvic exam?;

Any current symptoms of vaginitis, etc.;

Are you sexually active at present?;

Physical examination results regarding vagina, cervix and associated parts.

Additional Student Health Services and University Hospital records contain documents relating to Ms. Mann's medical treatment which, if further described, would violate her right to privacy. This treatment occurred prior to the time of the events alleged in this case. None of the aforementioned records are discoverable, because they have virtually no relevance to the issues in

Code § 4732.19 (HISTORY) (Page Supplement 1993).

this case and the privacy interest in them is great.[5]

There can be no question that the aforementioned information is of such a private nature that a constitutional right to privacy exists. In a civilized society in the year 1993, where vast amounts of personal information are contained not only in medical files but in computerized data banks or other massive government files, much of which is personal in character and potentially embarrassing or harmful if disclosed, *see Whalen,* 429 U.S. at 605, 97 S.Ct. at 879, the constitutional right to privacy is surely as significant as the protection of commercial information specifically recognized by Rule 45(c)(3)(B)(i). At least two privacy interests regarding medical records are implicated. The first, of course, is right to non-disclosure of private information. The "right to be let alone" is "the right most valued by civilized men." 429 U.S. at 599 n. 25, 97 S.Ct. at 877 n. 25 (quoting Justice Brandeis' dissent in *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928)). The second is the right to health care. If patients have a genuine concern that their private medical information will become publicly known and may adversely affect their reputations or embarrass them, they will be reluctant to seek medical assistance. Thus, patients' interest in making decisions vital to their health care may be impaired by unwarranted disclosures. *See Whalen,* 429 U.S. at 600, 97 S.Ct. at 876. These same reasons support a doctor-patient privilege.

Medical care providers, such as the University Hospital and the University Student Health Services, who create and maintain such information have a concomitant duty to avoid unwarranted disclosures. We believe that duty has its roots in the Constitution. *See Whalen,* 429 U.S. at 605, 97 S.Ct. at 879. Thus, aside from its duty as a party to this litigation not to violate Ms. Mann's doctor-patient privilege and privacy right, the University has a separate duty as a custodian of private medical information to protect her records from unjustified intrusion.

## DEFENDANTS' ATTORNEY AND UNIVERSITY COUNSEL KNEW OR SHOULD HAVE KNOWN THAT MS. MANN'S MEDICAL RECORDS WERE PROTECTED

Not only should defendants' attorney and University counsel have been aware of the case law indicating that Ms. Mann's medical records were protected by constitutional privacy rights and the doctor-patient privilege, but it also appears from their actions that they were in fact aware of these protections. In the absence of the existence of a constitutional privacy right or a privilege, there was no reason for them to subpoena records that were already in their client's possession. Since, absent a privilege or privacy right, their client was free to discuss its own records with its counsel, the only possible purpose for issuing the subpoena was in recognition that Ms. Mann had the right to assert a privilege or privacy right.

## DEFENDANTS' ATTORNEY AND UNIVERSITY COUNSEL VIOLATED RULE 45, MS. MANN'S PRIVACY RIGHT, AND HER DOCTOR–PATIENT PRIVILEGE

The history of the federal discovery rules demonstrates that, while the current rules favor open discovery, the party seeking discovery is required to give the person or entity from whom discovery is sought and all other parties a reasonable opportunity to object on the basis of a privacy right, a privilege, or irrelevancy.

In 1937, Rule 45 was adopted to provide for subpoenas ad testificandum and duces tecum to be issued by the district courts for attendance at hearings, trials, and depositions. FED.R.CIV.P. 45 advisory committee's note on rules 1937 adoption. The requirement of a court order for issuance of a

---

5. The Student Health Services Records delivered on April 12, 1993, were accompanied by a note written by Ms. Mann to the Magistrate Judge. The Magistrate Judge's secretary advised Ms. Mann that her *ex parte* communication would not be given to him. This note was observed, but not read by the Magistrate Judge, on June 3, 1993, when the records were unsealed. Because it is an improper *ex parte* communication, the contents of the note have never been revealed to the Magistrate Judge. It will be sealed and maintained with the other records in this case.

subpoena duces tecum was in accordance with former Title 28 U.S.C. § 647, which permitted a party to require a deponent to produce and testify about documents during his deposition. Id. A subpoena for documents to be produced at a deposition could only be obtained with leave of court for good cause shown. The recipient of the subpoena then had to appear and produce the documents at THE deposition. Id., advisory committee's note on 1946 amendment.

In 1946, Rule 45 was amended to eliminate the requirement to seek a court order because it was felt to be oppressive on counsel and the court. The amended Rule permitted the clerk of courts to issue a deposition subpoena duces tecum without a showing of good cause and substituted in its stead provisions for an aggrieved party to file a motion for protective order under then Rule 30(b) (now Rule 26(c)) and a motion to quash under Rule 45(b). Id.; see also 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2451 at 421 (1971). The burden was transferred to the aggrieved party to demonstrate that discovery·was not warranted. Id.

Under the 1946 amendment, Rule 45 required that a deposition subpoena duces tecum be served on the opposing party ten days prior to the deposition date. While the deponent was required to appear at the deposition, produce the subpoenaed materials, and testify about them, the Rule did not place the deponent under a clear compulsion to permit their inspection and copying. FED. R.CIV.P. 45 advisory committee's note to 1970 amendment. No mechanism was provided for the court to resolve the matter. Id. This was corrected in 1970, when Rule 45 was amended to authorize inspection and copying of material produced at a deposition pursuant to a subpoena duces tecum. FED. R.CIV.P. 45 advisory committee's note to 1970 amendment.

In 1970, a comprehensive review of the discovery rules was undertaken and substantial changes were made. The discovery rules were rearranged, establishing Rule 26 as the Rule governing discovery in general. FED. R.CIV.P. Chapter V. advisory committee's explanatory statement concerning 1970 amendments of the discovery rules and advisory committee's note to 1970 amendment. The mechanics of discovery were redesigned to encourage extrajudicial discovery with a minimum of court intervention. The party seeking discovery, rather than the objecting party, was made responsible for invoking judicial determination of unresolved discovery disputes. Id.

Although the Supreme Court has long held that the discovery rules are an integrated mechanism and must be read *in pari materia*, see *Hickman v. Taylor*, 329 U.S. 495, 505, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1947), prior to 1970 there was no provision generally applicable to all discovery. The 1970 revision made Rule 26 this vehicle. FED.R.CIV.P. Chapter V. advisory committee's comments: rearrangement of the discovery rules. Revised Rule 26(b)(1) provided for discovery of any matter so long as it was "relevant to the subject matter of the pending action" and "not privileged." Rule 26(c) provided that either a party or a person from whom discovery is sought may seek a protective order regarding matters relating to a deposition. Rule 45(b) continued to provide for a motion to quash a deposition subpoena.

Thus, the state of the law in 1970 was that documents obtained through a deposition subpoena duces tecum were to be produced at the deposition and inspection and copying could also occur at that time. Either the opposing party or the deponent had the right to object to document discovery on the basis that it was privileged or irrelevant. The party seeking discovery then had the duty to file a motion to compel with the court. The objecting party was also permitted to seek a protective order or a motion to quash. Since the documents were not to be produced for inspection until the date of the deposition, an opposing party had until the date set forth in the deposition subpoena to seek a protective order. Rule 30(b)(1) required the party issuing a deposition subpoena duces tecum to give reasonable notice in writing to every other party. FED.R.CIV.P. 30 advisory committee's notes to 1970 amendment. Rule 45 specified ten days as reasonable notice. FED. R.CIV.P. 45 advisory committee's notes to 1991 amendment. Thus, absent extenuating

circumstances, an objecting party had to be given at least ten days to move for a protective order or to quash the subpoena.

In 1991, significant changes were made to Rule 45. Instead of obtaining a subpoena duces tecum from the clerk of courts, attorneys were now authorized to issue them on their own signature, carrying the authority of a court order to produce documents. FED. R.CIV.P. 45(a)(3). In addition, an attorney could command a subpoena recipient to produce the requested documents ex parte without having to appear at a deposition. FED. R.CIV.P. 45(a)(1). The rule also specifically restated Rule 30(b)(1)'s requirement that prior notice of production of documents be served on each party. FED.R.CIV.P. 45(b)(1). Finally, the ten day notice requirement to deponents and other parties was extended to fourteen days, FED.R.CIV.P. 45(c)(2)(B), because the ten day period was considered too short. The drafters wished "to allow more time for such objections to be made." [6] FED. R.CIV.P. 45 advisory committee's notes to 1991 amendment.

Providing attorneys authority to issue subpoenas on their own signature as a court mandate and to obtain documents ex parte without the custodian appearing for deposition constituted a substantial empowerment of the bar. "[N]ecessarily accompanying the evolution of this power of the lawyer as an officer of the court is the development of increased responsibility and liability for the misuse of this power." FED.R.CIV.P. 45 advisory committee note to 1991 amendment. Thus, an attorney seeking document discovery was now under a heightened duty to properly notify other parties and to provide a reasonable time period for the subpoena recipient and other parties to object.

We now turn to the facts of this case to determine whether defendants complied with the federal discovery rules. Ms. Mann asserted her privilege and right to privacy with respect to her medical records by refusing to sign a release when it was first requested during her deposition. She felt her medical records were so private she did not wish her attorney to examine them. The parties were then obligated to attempt to resolve the dispute extrajudicially. *See* S.D. Ohio Rule 37.1. That is what they were in the process of doing between March 2 and April 9, 1993. The District Judge had not yet held a scheduling conference or set a discovery deadline. Therefore, there was no urgency. Had defendants' attorney waited one more week, the relevant records may have been produced voluntarily. In fact, on April 8, 1993, plaintiff's attorney advised defendants' attorney that Ms. Mann would voluntarily produce medical records on a number of subjects, and only objected to producing gynecological information.

Although Ms. Mann bore the burden of convincing the Court that her gynecological records were entitled to protection from discovery, defendants' counsel had no right to resolve this issue unilaterally. Whether the privacy or privilege claim is valid is not the question. When a colorable claim is asserted, it is the court which must resolve the issue, not the attorney seeking discovery.

█ The appropriate procedure to follow when privilege is asserted is as follows: The party seeking discovery must file a motion to compel or may, as in this case, subpoena the records. In the absence of a motion to compel, the party claiming the privilege must file either a motion for protective order or a motion to quash the subpoena. The allegedly privileged materials should be submitted to the Court for *in camera* review, where the resisting party's claims of privilege and irrelevance can be balanced against the opposing party's claims of relevance and need. *See Kerr v. United States District Court for the Northern District of California*, 426 U.S. 394, 405–406, 96 S.Ct. 2119, 2125, 48 L.Ed.2d 725 (1976); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Reyn-*

---

**6.** Rule 45(c)(2)(B) provides in pertinent part: "a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena *or before the time specified for compliance if such time is less than 14 days after service,*" serve objections to the inspec-

tion. (Emphasis supplied). The emphasized language does not give the attorney unfettered discretion to issue a subpoena for production in less than 14 days. It simply recognizes there may be exigent circumstances requiring such action in an unusual case.

**1202**

*olds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). During the *in camera* inspection, the court can weigh the competing interests, order certain documents produced or protected, and excise portions of documents found to be privileged where other parts are found to be discoverable. The same procedure applies where, instead of or in addition to privilege, a constitutional right to privacy is asserted. *See Whalen,* 429 U.S. at 600, 97 S.Ct. at 877; *Zuniga,* 714 F.2d at 642; *Fisher,* 753 F.Supp. at 694.

Although defendants' attorney and University counsel were within their rights in issuing a Rule 45 subpoena, the manner in which they issued the subpoena and obtained the records was improper and violated not only Rule 45 but also Ms. Mann's privacy right and privilege, for the following reasons.

■ First, issuance of the subpoena on one week's notice was unreasonable and violated Rule 45(c)(2)(B). As stated above, since a discovery deadline had not yet been established, there was no urgency justifying such short notice. Plaintiff's attorney, a sole practitioner, was given less than one week to prepare a formal objection and file it with the court, regardless of what his schedule may have been for that week.

■ Second, the subpoena was overly broad and not properly limited to relevant and non-privileged information. Neither defendants' attorney nor University counsel had a reasonable basis for believing that Ms. Mann's entire medical file was relevant to the issues raised in this case. On the other hand, they had every reason to believe that a student such as Ms. Mann would utilize the Student Health Services in much the same manner as a patient would utilize her own family doctor, internist, or gynecologist. Thus, there was reason to believe that the very private, irrelevant information that is in fact contained in the records existed.

■ Third, defendants' attorney violated both the letter and the spirit of the discovery rules in general and Rule 45 in particular by instructing the subpoena recipient via an ex parte communication that the only alternative to appearing at her law firm on April 9 with the documents listed was to provide those documents *before* the subpoena production date. Nothing in Rule 45 requires a subpoena recipient to appear at the issuer's law firm to produce records, and nothing in Rule 45 authorizes an instruction to produce documents prior to the subpoena date. The form language on the reverse of the subpoena makes it clear that the recipient need not appear in person at the place of production so long as the records are provided. Defendants' argument that the recipient had to produce the records prior to the subpoena date to avoid contempt proceedings for failure to produce at the time and place designated on the subpoena is, frankly, ridiculous. It is ludicrous to believe that defendants' attorney would institute contempt proceedings against her own client for producing records at the Student Health Center on the production date instead of counsel's law offices.

Rules 26 and 45, read together, require that reasonable notice be given in writing to the recipient and other parties so that they have an adequate opportunity to object. Plaintiff's attorney was entitled to, and did in fact believe that he had until at least April 8, 1993, to file a motion opposing release of Ms. Mann's medical records. He could not possibly have known that he had to act by the morning of April 6, 1993, to prevent disclosure. The statements of defendants' attorney and University counsel to the effect that they unilaterally determined that plaintiff's attorney had sufficient time to file a motion by the morning of April 6, 1993 is indicative of the overly aggressive style of litigation they practiced, which is deserving of sanctions. Defendants' attorney knew plaintiff's attorney would not be prepared by April 6 to oppose the subpoena, because he told her on April 1 that he needed until April 9 to resolve the issue.

The ex parte instruction to the subpoena recipient to produce the records before the deadline indicates an intent to deprive Ms. Mann of her opportunity to challenge the subpoena. Defendants' attorney's failure to advise plaintiff's attorney that she would examine the records on April 6 strongly sup-

ports the conclusion that she did not intend to provide him an opportunity to object. Indeed, in her brief she argued she was not required to notify him. (Doc. 10, p. 3). The failure of defendants' attorney and University counsel to advise plaintiff's attorney that the records had already been examined after they learned he had contacted the Student Health Services on April 6 indicates they knew they had done something improper.

■ Fourth, defendants' attorney and University counsel knowingly violated Ms. Mann's privilege and constitutional privacy right. They were put on notice of a possible privilege and privacy right in several ways: a) the records sought were medical records which they knew were privileged under Ohio law; [7] b) they should have known either that a patient's medical records are protected by the federal constitutional privacy right or at a minimum that Ms. Mann had a colorable claim of a constitutional privacy right; c) they knew that Ms. Mann had asserted her privacy right and privilege at her deposition by refusing to sign a release; and d) the request for a release and the subsequent issuance of a subpoena to their own client demonstrates their awareness that the records were protected.

Knowing the records were protected, these attorneys had no right to examine them, even if they believed the privilege had been waived or Ms. Mann's privacy right did not outweigh the relevancy of the records, until Ms. Mann had a reasonable opportunity to object and seek a Court ruling. There is no justification for defendants' attorney secretly travelling to the Student Health Services on April 6, 1993, reviewing Ms. Mann's medical records before Ms. Mann had a reasonable opportunity to object, and sharing the information with University counsel.

■ Fifth, the University of Cincinnati violated its duty to its patient by failing to inform her that her records were being disclosed. The Ohio law of physician-patient privilege and the federal constitutional right of privacy in one's medical records place a duty on a medical provider not to disclose medical records in the absence of either a release from the patient or a valid court order. The University of Cincinnati had neither on April 6, 1993, when it released Ms. Mann's records. While the University might be excused had it received improper advice from a litigant's attorney in a case to which it was not a party, that is not the situation here. In the instant case, the University's own inside and outside counsel engaged in what can only be viewed as a charade. They advised the Student Health Services how it should respond to their own subpoena. In so doing, they did not consider the University's duty to keep its patient's records confidential. The University's own counsel ordered the disclosure without any notification to the patient. The disclosure was engineered to take place in such a manner that the patient would not know of it beforehand and would have no reasonable opportunity to object. The University then continued to violate its duty to the patient by failing to notify her that her records had been inspected after her attorney inquired on April 6, 1993.

■ Sixth, engaging in the telephone hearing with the Magistrate Judge which resulted in a determination to make an *in camera* review was a needless waste of time. Had the Court known the records had already been reviewed and copied, there would be no purpose for an *in camera* review. The Court would have moved directly to the issue of sanctions. The telephone conference resulted in sending Ms. Mann on a wild goose chase to obtain records to submit *in camera,* wasting her time and causing her further distress. Somewhat tempering this impropriety is the fact that defendants' attorney did file a brief in the clerk's office prior to the telephone conference and admitted reviewing the records, although she did not reveal she had copied them.

## DEFENDANTS' ATTORNEY AND THE UNIVERSITY MUST BE SANCTIONED

■ "A motion to disqualify counsel is the proper method to bring an alleged breach of ethical duties to the court's attention."

---

7. As late as May 12, 1993, in a brief filed with this Court defendants' attorney asserted that the Ohio law of privilege applied to Ms. Mann's medical records. *See* Doc. 10.

*Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742 (5th Cir.1980); *Kitchen v. Aristech Chemical*, 769 F.Supp. 254, 256 (S.D. Ohio 1991) (J. Weber). Federal courts judge an attorney's professional conduct by ethical standards defined by federal law. *In re Snyder*, 472 U.S. 634, 645 n. 6, 105 S.Ct. 2874, 2881 n. 6, 86 L.Ed.2d 504 (1985). Plaintiff, however, has failed to cite any authority which indicates that the activity complained of in this case constitutes a breach of ethical duties warranting disqualification. Although defense counsel's conduct violated the civil procedure rules as well as plaintiff's privilege and privacy right, plaintiff has not proven that it rose to the level of violating the Code of Professional Responsibility.[8] Therefore, we decline to take the drastic step of disqualifying defendants' law firm.

Nevertheless, we have serious concerns about the overly aggressive conduct of defendants' attorneys in this case, for which they have shown no remorse. Their claim that because the University maintained medical records, its attorneys were free to review them is ludicrous. This argument, taken together with their statement that "[p]laintiff has not been harmed in any way" (Doc. 10, p. 5), demonstrates that they do not appreciate the constitutional privacy right and privilege patients possess in their personal medical information. The disclosure of Ms. Mann's private information to defendants' attorney and University counsel constituted per se damage to Ms. Mann. These two lawyers simply have no business knowing when Ms. Mann may have first had intercourse, who her sexual partners may have been, what diseases she might have had, what her menstrual history is, etc. Furthermore, the possession of such information may give them improper leverage in connection with this litigation. The fear that other private information may be obtained by defense counsel or that the present information has been or will be revealed to others, including the named individual defendants, may have a chilling effect, causing Ms. Mann to consider dismissal or settlement for a minimal sum rather than face further embarrassment. In this connection we note that Ms. Mann was extremely reluctant to have even the Court review her private records *in camera.* Furthermore, defendants' attorneys have shown no professional respect for their opponent's right to limit improper discovery.

We are also very concerned about defendants' representation that production of medical records by the University of Cincinnati prior to the date listed on court subpoenas is not limited to this case, but is a common practice. This means that the right of a patient or opposing party to contest subpoenas for University of Cincinnati medical records is effectively curtailed. In this case, the patient happened to be a party, and thus was required to be notified under Rule 45. In other cases, such as those cited *supra*, pp. 1195–1197, the patient was not a party to the litigation. In such cases, the civil rules do not require the parties or the University to notify the patient before disclosure, and it appears from the information presented at the hearing that the University does not do so. Thus, the non-party patient has no opportunity to object when records are obtained through a Rule 45 subpoena to the University. This practice may violate the University's duty to avoid unwarranted disclosures. *See Whalen*, 429 U.S. at 605, 97 S.Ct. at 879.

Although it is not our function to rule on cases not before the Court, we think it prudent to put the University on notice that Rule 45 subpoenas are issued by attorneys, without the Court's knowledge; thus, receipt of a subpoena is not an indication that the Court has determined the records may be released. Despite the Court mandate inherent in the subpoena, the University owes a duty to the patient to either assert the patient's privilege or to give the patient a reasonable opportunity to do so. As a state institution, the University may be subjecting itself to possible 42 U.S.C. § 1983 claims for violation of its patients' Fourteenth Amendment privacy rights by failing to notify them prior to disclosing their medical records.

Because both the University and its counsel violated Rule 45, Ms. Mann's constitutional privacy right, and her doctor-patient privilege, they should be sanctioned.

---

8. *See,* however, Ohio Code of Professional Responsibility, DR 7–107(C)(7).

■ For a number of reasons, a punitive monetary sanction is not appropriate.[9] First, it has not been demonstrated that the University or defendants' counsel have done anything illegal or unethical; nor have they disobeyed a Court order. Secondly, monetary sanctions which have the effect of cost-shifting are the subject of substantial criticism and have been disapproved by the drafters of the pending amendments to the federal rules. *See* advisory committee's notes on proposed amendments to the Federal Rules of Civil Procedure, Rule 11, payment of monetary sanctions to an adversary (April 15, 1992). Third, defendants' attorney is relatively inexperienced, having been admitted to the bar less than five years ago. Cincinnati Bar Association, 1992–1993 Legal Directory. On the other hand, because Ms. Mann's constitutional privacy right, her doctor-patient privilege, as well as the federal discovery rules were violated, significant sanctions are in order.

For abuse of the discovery rules, defendants should be made to forfeit any right they had to the small amount of relevant medical information they improperly obtained, with one exception noted below. In this case, such a sanction is not overly harsh. The records in question are not pertinent to the issue of liability, and bear only on the issues of damages and perhaps credibility. Furthermore, they have the potential to prejudicially influence the trier of fact on the liability issue and raise collateral issues that may waste time; thus, they may ultimately be excluded anyway pursuant to FED.R.EVID. 403. To the extent that defendants will be punished by being unable to utilize evidence that is relevant to the issue of damages and perhaps credibility, that is the purpose of this sanction. The Student Health Services records and Dr. Kindel's records, as well as any other records obtained through the improper practices analyzed above may not be used in any way in this case.

In addition, defendants must compensate Ms. Mann for the unwarranted violation of her constitutional privacy right, and for the costs of litigating this issue. In determining the appropriate amount of this sanction, we have substantially reduced it to take into account the fact that the unwarranted disclosure was apparently limited to defendants' attorney and University counsel. They have made a professional representation that no one else, including the named defendants, have seen the protected records.

## CERTAIN MEDICAL RECORDS ARE DISCOVERABLE

■ The only exception to the aforementioned ruling involves the one page undated record of Dr. Hani Abdulla. This document must be provided to defendants, because Ms. Mann voluntarily disclosed its contents to the University in her May 28, 1991 letter. Ms. Mann's disclosure of the diagnosis of anxiety by Dr. Abdulla waived her doctor-patient privilege regarding that particular record and prevents her from now claiming that the record is private.

There has been no evidence presented that the University Hospital records were subpoenaed or reviewed prior to a subpoena production date. Therefore, these records are discoverable if the relevancy of them outweighs Ms. Mann's privacy interest. In this respect, she and her attorney have examined them and advised the Court that they do not object to five pages, which are being placed under separate seal. The remaining records, to which she does object, involve medical treatment prior to the events alleged in this case. There is little likelihood this treatment produced anxiety during the pertinent time period. Furthermore, the privacy interest in such information far outweighs any slight relevancy the evidence might have to the damages issue. Upon the filing of an affidavit that no defense attorney has yet seen the University Hospital records, the discoverable portion will be provided defendants.

## IT IS THEREFORE ORDERED THAT:

1. The University of Cincinnati and its inside and outside counsel are hereby PROHIBITED from utilizing or disclosing, for

9. In the past, this Court has imposed monetary sanctions of up to $50,000 for severe violations of the discovery rules.

**1206**

any purpose, any medical information regarding Ms. Mann obtained pursuant to a Rule 45 subpoena duces tecum prior to the production date set forth on the subpoena, including the Student Health Services Records and Dr. Kindel's records, with the exception of the one page undated report of Dr. Hani Abdulla. Any copies of such records presently in defendants' possession must be returned to the custodian. Nor may defendants utilize or disclose any other information, medical or non-medical, which they may have obtained on the basis of leads provided by said medical records.

2. Upon the filing of an affidavit that defense counsel have not reviewed the University Hospital Records, the discoverable portion of said records will be provided to them.

All medical records provided through discovery are to be disclosed to defendants' counsel only. They may not be revealed to any other person, including the named defendants, without the Court's permission.

3. As required by Rule 45 and the general practices of this Court, defendants and their counsel must provide at least fourteen days notice to opposing counsel on all future subpoenas, absent exigent circumstances.

4. Defendants and their counsel are PROHIBITED from examining subpoenaed records prior to the return date of the subpoena.

5. The University of Cincinnati and its attorneys, being jointly liable for violating Ms. Mann's constitutional privacy right and her doctor-patient privilege by obtaining extremely private medical information which is irrelevant to this case are to compensate Ms. Mann in the amount of $2,500 and to pay the costs associated with preparing and arguing plaintiffs' motions for protective order, to quash subpoena, and for sanctions. Plaintiff's attorney is to file an affidavit within 60 days setting forth with specificity the hours spent on said activities and the reasonable hourly rate. Defendants then have 30 days to advise the Court whether they wish to challenge the reasonableness of the hours or the fees. If so, a hearing will be scheduled.

6. The Clerk of Courts is to serve a copy of this Order on the President of the University of Cincinnati so the University may review and reconsider its claimed practice of releasing medical information before the subpoena production date and without notice to the patient.