Ronald OMAN, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 46S03–9909–CR–00495.

Supreme Court of Indiana.

Sept. 26, 2000.

1132

Donald W. Pagos, Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos, LLP, Michigan City, IN, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Priscilla J. Fossum, Stephen K. Tesmer, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

Defendant Ronald Oman was the driver of one of two fire trucks that collided en route to a fire call. Oman submitted to a urinalysis as a condition of his employment in a safety-sensitive job. Acting on a tip that Oman had tested positive for marijuana, a deputy prosecutor subpoenaed the

lab for the test result and then charged Oman with driving while intoxicated. Finding that the subpoena was reasonable, that Michigan City's drug testing programs is constitutionally sound, and that no authority shields the results of constitutionally sound testing programs from valid legal compulsory process, we hold that the trial court was correct in not suppressing Oman's post-accident toxicological test results.

### Background

Defendant, Ronald Oman, is a firefighter employed by the city of Michigan City, Indiana. Michigan City has in place a Drug and Alcohol Free Workplace Ordinance ("Ordinance"). The Ordinance provides that upon certain events, employees must submit to a urine test and a breath test to screen for illegal substances and alcohol. Refusal to submit to the tests results in an automatic thirty-day suspension without pay and risk of termination. The Ordinance includes a confidentiality provision which states, *inter alia*, that test results will be maintained only in the employee's confidential file, that test results will not be disclosed without the employee's written consent, but that disclosure will take place when "compelled by law or by judicial and administrative process."

On April 28, 1998, Oman was the driver of one of two fire trucks that collided en route to a fire call. As per the Ordinance, both drivers were directed by their supervisor to submit to post-accident toxicological testing and thus were driven from the scene to NIMLS, a city-approved lab for drug testing.[1]

That evening, the Assistant Chief of Police called and told Officer Kunkle[2] that an unidentified source had informed him that Oman's drug tests were positive. Based on this information, Officer Kunkle asked the deputy prosecutor to subpoena Oman's test results. Without seeking leave of court, the deputy prosecutor issued a subpoena *duces tecum* directing the testing lab to produce Oman's test results. The lab complied, and the results revealed that Oman had tested positive for marijuana. He was charged with operating a vehicle with a controlled substance in his blood, a Class C misdemeanor.[3] Oman moved to suppress his test results. The trial court denied his motion and certified the issue for interlocutory appeal.

The Court of Appeals reversed, finding that the prosecutor did not have probable cause to issue the subpoena *duces tecum* in that it was based on "unreliable" information; that the improperly issued subpoena thus represented an "unreasonable" demand on the lab; and that the use of Oman's drug test results in a criminal prosecution against him violated his Fourth Amendment rights. *Oman v. State*, 707 N.E.2d 325 (Ind.Ct.App.1999).

This appeal presents several interesting and important questions, which we order for discussion as follows: (1) Must a prosecutor acting without a grand jury seek leave of a court before issuing an investigative "prosecutor's" subpoena *duces tecum* to a third party? (2) If so, what are the appropriate criteria for evaluating the application and issuance of a prosecutor's investigative subpoena *duces tecum* ? (3) Are government drug testing programs such as Michigan City's constitutionally sound? (4) Are toxicological results from these drug testing programs admissible in a criminal proceeding against the employee? And (5) did the trial court err in

---

1. Oman testified at the suppression hearing that he was not tested for sobriety at the accident scene. However, the police report specifically noted that both drivers had ".00% BAC." (R. at 11; Indiana Officer's Standard Crash Report.) For purposes of this appeal, we assume that the Michigan City Police Department did not possess the capability (i.e., the equipment) to field assess the presence of THC (the active ingredient in marijuana) in a driver's bodily fluids.

2. As best as we can tell, Officer Kunkle was not the investigating officer at the accident scene.

3. Ind.Code § 9–30–5–1 (1993).

denying Oman's motion to suppress the results of his post-accident drug test?

### Discussion

■ We first address the State's claim that Oman does not have standing to challenge the validity of a subpoena issued to the NIMLS lab, a non-party. A party generally lacks standing to challenge the validity of a subpoena issued to a third party. *See, e.g., Leonard v. State,* 249 Ind. 361, 365, 232 N.E.2d 882, 885 (1968); *Cox v. State,* 181 Ind.App. 476, 392 N.E.2d 496 (1979). However, a party may establish standing if he or she demonstrates a personal stake in the outcome of the lawsuit and if he or she has sustained or is in immediate danger of sustaining some direct injury as a result of the conduct at issue. *See Hammes v. Brumley,* 659 N.E.2d 1021, 1029 (Ind.1995); *Cody v. State,* 702 N.E.2d 364, 367 (Ind.Ct.App. 1998).

Here, Oman challenges the validity of a subpoena issued to a third party lab that produced evidence forming, in part, the State's charge against him for driving while intoxicated. We have little difficulty in finding that Oman had a legitimate interest in challenging the validity of this

evidence. *Cf. United States v. Raineri,* 670 F.2d 702, 712 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982) ("A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests."); *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (analyzing a defendant's claim that subpoenas *duces tecum* were defective in that they violated his reasonable expectation of privacy in bank records despite the fact that the prosecuting attorney obtained the records from a third party bank). Accordingly, we turn our attention to the merits of this appeal.

## I

■ While engaged in the "competitive enterprise of ferreting out crime," *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), Indiana prosecutors must occasionally invoke their statutory power to gather evidence while conducting pre-charge investigations.[4] Indiana Code § 33–14–1–3 outlines the legal process for prosecutors to follow and

4. Because the Fourteenth Amendment Due Process Clause does not incorporate the Fifth Amendment right to be charged by a grand jury indictment, *see Clanton v. Cooper,* 129 F.3d 1147, 1155 (10th Cir.1997), state legislatures are free to authorize their prosecutors to perform investigative (and charging) functions historically reserved for grand juries. Indiana and a handful of other states have authorized their prosecutors to issue pre-charge investigative subpoenas. *See* Ark. Code Ann. § 16–43–212 (Michie 1994); Del. Code Ann. tit. 29, § 2508(a) (1991); Fla. Stat. Ann. § 27.04 (West Supp.1997); Haw.Rev. Stat. § 28–2.5 (1993); Iowa Code Ann. § 813.2, rule 5, subd. 6 (West Supp.1996); Ind.Code § 33–14–1–3 (1996); Kan. Stat. Ann. § 22–3101 (1999); La.Code Crim. Proc. Ann. art. 66 (West Supp.1997); Mich. Comp. Laws Ann. § 767.3 (West Supp.1997); Mo. Rev.Stat. § 56.085 (1994); Mont.Code Ann. § 46–4–301 (1997); Or.Rev.Stat. § 180.073 (1996); Utah Code Ann. § 77–22–2 (1995). *See generally* H. Morley Swingle, *Criminal Investigative Subpoenas: How To Get Them, How To Fight Them,* 54 J. Mo. B. 15 (1998).

For reasons that will become apparent later, we note there is no federal counterpart to a state prosecutor's investigative subpoena power. As such, while federal prosecutors " 'engaged in grand jury investigations properly may have subpoenas issued without the grand jury's authorization or awareness to compel attendance of witnesses before the grand jury, ... they may not use the grand jury subpoena power to gather information *without the intended participation of the grand jury.' " United States v. Santucci,* 674 F.2d 624, 627, 632 (7th Cir.1982) (emphasis added) (quoting Holderman, *Preindictment Prosecutorial Conduct in the Federal System,* 71 J.Crim. L & C 1 (1980)) (affirming the issuance of grand jury subpoenas *duces tecum* for the production of handwriting exemplars, photographs, etc., that were neither sought nor obtained from any grand jury, nor had the case been opened before a grand jury, however, "[n]othing in the record suggest[ed] any intent to exclude the grand jury from all exposure to the collected evidence"), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983).

exists today in the same form as it was originally enacted in 1852: [5]

> Whenever any prosecuting or district attorney shall receive information of the commission of any felony or such district attorney of the commission of any misdemeanor he shall *cause process to issue from a court* having jurisdiction to issue the same, (except the circuit court,) to the proper officer, directing him to subpoena the persons therein named likely to be acquainted with the commission of such felony or misdemeanor, and shall examine any person so subpoenaed before such court touching such offense. . . .

*Id.* (emphasis added). The State contends that this statute authorizes a prosecutor – acting without a grand jury – to issue an investigative subpoena *duces tecum* to a third party for the production of documentary evidence without processing the request through an appropriate court. Oman disagrees with this contention.

### A

We note initially that the plain language of the statute – our first line of inquiry – evinces a legislative intent for "court" involvement during the pre-charge, investigative stage. However, it is not altogether clear to us, and neither party has contended, that the statute *literally* requires a prosecutor to seek leave of court *before* issuing an investigative subpoena.

Our research has identified two older Indiana decisions that appear to approve prosecutor subpoenas *ad testificandum*, issued without court review, to compel answers to investigative questions. *See, e.g., Ellison v. State*, 125 Ind. 492, 496, 24 N.E. 739, 741 (1890); *West v. State*, 32 Ind.App.

161, 69 N.E. 465 (1904). These cases differ from the case before us in that they involve subpoenas *ad testificandum* (issued to compel a witness to give a precharge, out-of-court statement or to eventually testify in court) as opposed to subpoenas *duces tecum* (issued for the production of tangible evidence).

We also observe that our recent decisions concerning the propriety of subpoenas *duces tecum* are not particularly instructive in that they address subpoenas issued after criminal charges have been filed. *See In re WTHR–TV*, 693 N.E.2d 1 (Ind.1998) (holding that the rules of trial procedure generally apply to criminal proceedings absent a conflicting criminal rule); *Rita v. State*, 674 N.E.2d 968 (Ind. 1996) (construing Ind.Code § 33–14–1–3 to only apply to pre-charge inquiries so that a prosecutor may not issue investigatory subpoenas to take *ex parte* statements of witnesses after charges were filed but before trial). As such, we look to another decision from this Court, which both parties cite for their respective positions.

In *In re Order for Indiana Bell Telephone to Disclose Records*, 274 Ind. 131, 409 N.E.2d 1089 (1980), the police received information that two escapees from the Monroe County Jail were making long distance collect telephone calls to their parents. The police provided this information to the prosecutor who in turn filed an order to produce in the Monroe Superior Court, directing "Indiana Bell to reveal to the prosecutor the long distance telephone records of two specific customers who were the parents of the two escapees." *Id.* at 132, 409 N.E.2d at 1090.[6]

---

**5.** In fact, as best as we can tell, Indiana's prosecutor subpoena statute was the very first of its kind: Indiana (1852); Florida (1877); Michigan (1927); Louisiana (1928); Arkansas (1937); Delaware (1953); Utah (1953); Kansas (1970); Hawaii (1972); Iowa (1976); Montana (1977); Oregon (1993); Missouri (1994). *See* statutes cited *supra* note 4.

**6.** The trial court stayed the order, and after hearing argument on the matter, it granted

the State's motion to produce and issued a subpoena *duces tecum*. The trial judge then certified the court's judgment to the Court of Appeals. *In re Indiana Bell*, 274 Ind. at 132, 409 N.E.2d at 1090. This Court accepted transfer under Appellate Rule 4(A)(10), which provided for petitioning the Supreme Court to transfer an appeal from the Court of Appeals to the Supreme Court upon a showing that the appeal involved a substantial question of law of great public importance and that an

After first determining that Indiana Bell's compliance with the subpoena *duces tecum* would not infringe upon the escapees' constitutional rights under either the First or Fourth Amendments, *id.* at 132–33, 409 N.E.2d at 1090–91, this Court then addressed the scope of the prosecutor's subpoena power.

As a matter of first impression, this Court decided "whether a prosecutor *acting without a grand jury* can subpoena a witness to reveal information concerning the activities of a suspected felon." *Id.* at 134, 409 N.E.2d at 1091 (emphasis added). After reviewing the relevant statutes – including that which empowered a prosecutor to charge an individual without first submitting the evidence to a grand jury – this Court held that a prosecutor "ha[d] the same ability to accumulate evidence as the grand jury," so that he or she could act without a grand jury in subpoenaing a witness to reveal information. *Id.* at 135, 409 N.E.2d at 1091.

In further support of this holding, this Court considered the same statute at issue in this case, Ind.Code § 33–14–1–3, and stated that a prosecutor "is not limited to issuing a grand jury subpoena to acquire evidence in a criminal case, but can, *through an appropriate court,* subpoena witnesses" for the production of documentary evidence maintained by a third party. *Id.* (emphasis added).

Oman finds ample support in this statement for his position and not surprisingly claims, "It is clear from this language that when a prosecutor issues subpoenas under Ind.Code § 33–14–1–3[,] the prosecutor

must first seek leave of court." Appellant's Br. at 10. On the other hand, the State posits that *Indiana Bell* "does not stand for the proposition that a prosecutor must seek leave of court to obtain a subpoena duces tecum. Rather, it stands for the proposition that if the prosecutor seeks to obtain a subpoena through a court, that court has jurisdiction to determine whether the subpoena should be quashed." Appellee's Br. at 6.

### B

We acknowledge that both parties present cogent arguments for their respective positions.[7] However, we side with Oman. We find the rationale for our statement in *Indiana Bell* that a prosecutor must act "through an appropriate court" to be persuasive here given the factual similarities of the two cases. In *Indiana Bell,* the prosecutor issued an investigative subpoena *duces tecum* to a third party telephone company for the production of otherwise confidential telephone records. In this case, the prosecutor issued a similar investigative subpoena *duces tecum* to a third party laboratory for the production of otherwise confidential drug test results. And this interpretation is consistent with the language of Ind.Code § 33–14–1–3, which requires a prosecutor to "cause process to issue from a court" during the pre-charge, investigative subpoena stage.[8]

■ Given that this statutory provision has existed for almost 150 years without definitive interpretation on this point – and what interpretation there has been appears to approve prosecutor subpoenas without court review[9] – we decline to ap-

---

emergency existed. *Id.* (current version at App. R. 4(A)(9)).

**7.** We also acknowledge the concern noted in the concurring opinion of Judge Brook. *See Oman,* 707 N.E.2d at 329–31 (Brook, J., concurring) ("I again suggest that Ind.Code § 34–14 –1–3 be interpreted to require judges or magistrates to review applications for subpoenas duces tecum in pre-charge criminal investigations.").

**8.** This interpretation also preserves the prosecutor's "discretionary judicial power to inves-

tigate and determine who shall be prosecuted and who shall not be prosecuted." *State ex rel. Spencer v. Criminal Court of Marion County,* 214 Ind. 551, 556, 15 N.E.2d 1020, 1022 (1938).

**9.** *See, e.g., Ellison v. State,* 125 Ind. 492, 492, 24 N.E. 739, 741 (1890); *West v. State,* 32 Ind.App. 161, 69 N.E. 465 (1904).

ply our conclusion to this case. Rather, in the exercise of our supervisory responsibility, *see Williams v. State*, 669 N.E.2d 1372, 1381–82 (Ind.1996), *reh'g denied*, we enunciate the following new rule of criminal procedure that will apply to investigative subpoenas issued after the date of this decision:[10] A prosecutor acting without a grand jury must first seek leave of court before issuing a subpoena *duces tecum* to a third party for the production of documentary evidence.

### C

■ One final issue in this regard requires our attention. The State claims that any decision we make concerning the prosecutor's "ability to investigate crime and collect evidence via an investigatory subpoena" will presumably impact a grand jury's ability to do the same. We disagree.

A grand jury derives its investigative power from a different statute, the language of which does not evince a legislative intent for *direct* court involvement during the pre-charge, investigative stage: "A subpoena duces tecum or subpoena ad testificandum summoning a witness to appear before the grand jury shall be issued by the clerk upon the request of the grand jury or prosecuting attorney. The subpoena must contain a statement of the general nature of the grand jury inquiry." Ind. Code § 35–34–2–5(a) (1993).[11]

Furthermore, indirect judicial oversight is an inherent part of all grand jury proceedings, which by their nature are secretive: this arrangement militates against the possible prejudicial impact of testimonial or physical evidence improperly gathered by a prosecutor during his or her precharge investigation. *See* Ind.Code § 35–34–2–4(i) (grand jury secrecy); *State ex rel. Meloy v. Barger*, 227 Ind. 678, 685, 88 N.E.2d 392, 395 (1949) ("A grand jury is an appendage of the court under whose supervision it is impaneled ...."); *see also United States v. R. Enters., Inc.*, 498 U.S. 292, 298–301, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991) (A grand jury subpoena is "presumed to be reasonable," in that an "application of [a pre-charge 'reasonableness'] test ignores that grand jury proceedings are subject to strict secrecy requirements," and "[r]equiring the Government to explain in too much detail the particular reasons underlying a subpoena threatens to compromise the indispensable secrecy of grand jury proceedings.") (internal quotations omitted).

We now proceed to identify the appropriate standard for the trial court to apply to the application and issuance of an investigative subpoena *duces tecum* for the production of documentary evidence maintained by a third party.

### II

### A

We begin our analysis of the criteria for concluding that an investigative subpoena has been properly issued by reviewing the decision cited by the Court of Appeals as its basis for finding that the subpoena was unreasonable. In *State ex rel. Pollard v. Criminal Court of Marion County*, 263 Ind. 236, 329 N.E.2d 573 (1975), this Court considered whether the statutory power of an Indiana grand jury was "limited to the

---

**10.** Notwithstanding that a judge or magistrate did not review the prosecutor's application for the subpoena *duces tecum* in this case, we find no reversible error in light of our forthcoming analysis that the requirements of the Fourth Amendment have been satisfied.

**11.** It should be noted that the statute requires that a grand jury subpoena contain a written advisement of the general nature of the grand jury inquiry. *See also State ex rel. Pollard v.*

*Criminal Court of Marion County*, 263 Ind. 236, 248, 329 N.E.2d 573, 582–83 (1975) ("If the personal records of public officials bear the indelible marks of illegal conduct, those records should, *with proper safeguards*, be made available for the grand jury's inspection. We, therefore, conclude that the grand jury may require witnesses to produce papers and documents relevant to the grand jury investigation.") (emphasis added).

issuance of subpoenas *ad testificandum,*" or whether it also included the power to issue subpoenas *duces tecum* for the production of "certain financial records." *Id.* at 238, 329 N.E.2d at 577. After an exhaustive historical analysis, the Court concluded, "[T]he grand jury may require witnesses to produce papers and documents relevant to the grand jury investigation." *Id.* at 248, 329 N.E.2d at 583.

Next, the Court considered the "constitutional safeguards" which delimited or controlled the "realm of permissible grand jury inquiry." *Id.* at 251–55, 329 N.E.2d at 584–86.

The fourth amendment requirement of "probable cause, supported by oath or affirmation" *is literally applicable only to warrants. See Oklahoma Press Publishing Co. v. Walling* (1945) [(1946)], 327 U.S. 186, 209, 66 S.Ct. 494, 90 L.Ed. 614, 630. Nevertheless, fourth amendment requirements of probable cause have been interpreted as applicable to subpoenas *duces tecum* to the extent that the grand jury or the prosecutor in issuing such subpoenas may not act arbitrarily or in excess of their statutory authority.

*Id.* at 253, 329 N.E.2d at 586 (emphases added). After identifying that a standard other than probable cause should logically apply to evaluate investigative subpoenas,[12] the *Pollard* Court then adopted the three-factor standard for reasonableness established by the United States Supreme Court in *See v. City of Seattle,* 387 U.S.

541, 544, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967):

> The *greatest protection* which the fourth amendment affords a witness subject to a grand jury subpoena *duces tecum* is the requirement of *reasonableness* .... And as summarized in *See v. City of Seattle* (1967), 387 U.S. 541, 544, 87 S.Ct. 1737, 1740, 18 L.Ed.2d 943, 947, the requirement is "that the subpoena be [ (1) ] sufficiently limited in scope, [ (2) ] relevant in purpose, and [ (3) ] specific in directive so that compliance will not be unreasonably burdensome."

*Pollard,* 263 Ind. at 254, 329 N.E.2d at 586 (emphases added).

■ We reaffirm this standard as it applies to the issue under consideration in *Pollard* : a party requesting a trial court to enforce, modify or quash a subpoena *duces tecum* already issued. *See also Sweeney v. State,* 704 N.E.2d 86, 108 (Ind. 1998) (applying a reasonableness standard to the county coroner's request to quash a subpoena *duces tecum* issued by the defendant).

We pause, however, to note important differences in the federal subpoena system – not fully developed when *Pollard* was decided – before adopting the three-factor *City of Seattle* test for reviewing the application and issuance of a prosecutor's investigative subpoena. *See supra* note 1 (noting that a federal prosecutor does not possess investigative subpoena power independent from the grand jury process).

**12.** *See also United States v. R. Enters., Inc.,* 498 U.S. 292, 297, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991) ("In short, the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists."); *accord Auto–Owners Ins. Co. v. State,* 692 N.E.2d 935, 939 (Ind.Ct.App.1998) ("Interpreting [a statute empowering the Attorney General to investigate violations of various business and trade laws] as requiring reasonable cause to believe that a statutory violation occurred before an investigation is even initi-

ated would produce an absurdity. The very purpose of an investigation under the statute is to determine if in fact a violation has occurred. If the State had reasonable cause to believe that a violation already existed, there would be no need for investigation in the first place."). *See generally In re Thompson,* 479 N.E.2d 1344, 1346 (Ind.Ct.App.1985) ("As the Indiana Supreme Court noted, the prohibitions of the Fourth Amendment are inapplicable to subpoenas duces tecum 'for the reason that subpoenas are incapable of accomplishing the constitutionally proscribed conduct.' ") (quoting *Pollard,* 263 Ind. at 252, 329 N.E.2d at 585).

B

The standard of "reasonableness" is unquestionably the touchstone of a properly issued federal subpoena; however, the United States Supreme Court has looked to the various contexts in which federal subpoenas are issued to determine the appropriate test. *See R. Enters., Inc.*, 498 U.S. at 299, 111 S.Ct. 722 ("[W]hat is reasonable" in evaluating investigative subpoenas *duces tecum* "depends on the context.") (internal quotations omitted).

The highest standard is applied to federal prosecutors who issue *post-charge* "trial subpoenas" in anticipation of trial because they must "clear three hurdles: (1) relevancy; (2) *admissibility* ; [and] (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (emphasis added). Conversely, the lowest standard is reserved for federal grand jury subpoenas (by their nature, investigative and issued *pre-charge* ), which are "presumed to be reasonable, [with] the burden of showing unreasonableness . . . on the recipient who seeks to avoid compliance." *R. Enters., Inc.*, 498

U.S. at 301, 111 S.Ct. 722.[13] Finally, *precharge* investigative subpoenas issued by administrative agencies—entities with both "investigative" duties akin to a grand jury and "accusatory duties" akin to a prosecutor, *United States v. Morton Salt Co.*, 338 U.S. 632, 643, 70 S.Ct. 357, 94 L.Ed. 401 (1950)—need only be " 'sufficiently limited in scope, relevant in purpose, and specific in directive,' " *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415, 104 S.Ct. 769, 78 L.Ed.2d 567 (1984) (quoting *City of Seattle*, 387 U.S. at 544, 87 S.Ct. 1737, and citing *Morton Salt*, 338 U.S. at 652–53, 70 S.Ct. 357).[14]

We view Indiana prosecutors—acting without a grand jury in gathering information to decide whether to bring criminal charges—as assuming a role similar to that of federal governmental agencies empowered with both "investigative and accusatory duties." *Morton Salt*, 338 U.S. at 643, 70 S.Ct. 357 ("When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.").[15] As such,

---

**13.** Indiana grand jury subpoenas are also issued with a presumption of reasonableness, *see supra* Part I–C (analyzing Ind.Code § 35–34–2–5(a)), placing a similar burden (and standard) of showing unreasonableness on the recipient who seeks avoidance, *see supra* Part II–A (discussing the procedural posture in which the *Pollard* court applied the *City of Seattle* test).

**14.** In *Donovan v. Lone Steer, Inc.*, the Court upheld the authority of the Secretary of Labor, investigating possible violations of the Fair Labor Standards Act, to issue an administrative subpoena *duces tecum* to a restaurant employee for the production of certain payroll and sales records. *See Donovan*, 464 U.S. at 409–11, 104 S.Ct. 769. The District Court had ruled, "[E]nforcement of the subpoena would violate the Fourth Amendment of the United States Constitution because the Secretary had not previously obtained a judicial warrant." *Id.* at 411, 104 S.Ct. 769. The Supreme Court reversed, citing the three-step test in *City of Seattle*, and noting, "[A]lthough our cases make it clear that the Secretary of Labor may issue an administrative subpoena without a warrant, they nonetheless provide protection for a subpoenaed employer by al-

lowing him to question the reasonableness of the subpoena . . . in district court." *Id.* at 415, 104 S.Ct. 769. The Court went on to hold, "[T]he defenses available to an employer do not include the right to insist upon a judicial warrant as a condition precedent to a valid administrative subpoena [*duces tecum* ]." *Id.*

We acknowledge that the three-factor *City of Seattle* reasonableness test dealt with federal agencies issuing administrative, investigative subpoenas *duces tecum* to "corporations[, which] can claim no equality with individuals in the enjoyment of the right to privacy." *Morton Salt*, 338 U.S. at 652, 70 S.Ct. 357. However, we also note that federal prosecutors—working through grand juries—issue investigative subpoenas *duces tecum* to individual citizens suspected of criminal activity, which are "presumed reasonable." *R. Enters., Inc.*, 498 U.S. at 301, 111 S.Ct. 722.

**15.** Consistent with our holding in Part I–B, *supra*, that a prosecutor must seek leave of court before issuing a pre-charge investigative subpoena *duces tecum* to a third party, we note that the United States Supreme Court also considered the propriety of authoritative

we view the three-factor reasonableness standard announced in *City of Seattle* as particularly appropriate for evaluating the application and issuance of a prosecutor's investigative subpoena in Indiana.[16]

This standard of reasonableness incorporates appropriate constitutional safeguards designed to limit overzealous prosecutors and at the same time minimize judicial second-guessing that could unnecessarily bog down pre-charge investigations.[17] *Cf. R. Enters., Inc.*, 498 U.S. at 298–301, 111 S.Ct. 722 (holding that the more demanding three-factor test for a "trial subpoena" announced in *Nixon* did not apply in grand jury proceedings, so as not to "saddle [the investigative entity] with minitrials and preliminary showings [that] would assuredly impede its investigation and frustrate the public's interest in the fair and

expeditious administration of the criminal laws") (internal quotation marks omitted).

 To reiterate, a properly issued investigative subpoena—one that is reasonable under the Fourth Amendment—must *only* be: (1) relevant in purpose; (2) sufficiently limited in scope, and (3) specific in directive so that compliance will not be unreasonably burdensome. *Pollard,* 263 Ind. at 254, 329 N.E.2d at 586; *see also Johnson v. State,* 925 S.W.2d 834, 835–36 (Mo.1996) (upholding the constitutionality of Missouri's prosecutor subpoena statute, which is similar to Indiana Code § 33–14–1–3) ("The United States Supreme Court has specifically required *only* that 'the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'") (emphasis added) (quoting *Donovan,* 464 U.S. at 415, 104 S.Ct. 769).[18]

oversight in the context of administrative subpoenas. *See City of Seattle,* 387 U.S. at 544–45, 87 S.Ct. 1737 ("[W]hile the demand to inspect may be issued by the agency, in the form of an administrative subpoena, it may not be made and enforced by the inspector in the field....").

16. We are aware of the decision in *United States v. LaSalle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), where the Supreme Court recognized that the use of an administrative subpoena by the Internal Revenue Service ("IRS") for the sole purpose of gathering evidence in a criminal prosecution would not be valid. *See id.* at 318, 98 S.Ct. 2357. The Court's limitation of the IRS, however, was not based on Fourth Amendment considerations, but rather on the IRS's lack of statutory authority, which is not at issue in this case.

17. This is also consistent with Indiana Code § 4–6–3–5 (1993), which provides in relevant part that a civil "investigative demand" by the state Attorney General "may not ... contain a requirement that would be *unreasonable* if contained in a subpoena or subpoena duces tecum issued by a court in a grand jury investigation." *Id.* (emphasis added). *See Auto–Owners Ins. Co.,* 692 N.E.2d at 939 (identifying the reasonableness standard identified in Ind.Code § 4–6–3–5 and then applying the reasonableness test adopted in *Pollard* ).

18. We do recognize that anonymous information in the form of a telephone tip lacks

sufficient indicia of reliability to justify, for example, a *Terry* stop and frisk. *See Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (holding that an anonymous telephone tip, without more, will not form the reasonable basis for justifying a *Terry* stop, which itself permits protective police searches under a lesser standard—reasonable suspicion—than probable cause). However, to the extent that the Court of Appeals in this case engaged in weighing the sufficiency, reliability, or veracity of the "information" justifying the issuance of a subpoena, it was wrong to do so. *See Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 207–08, 66 S.Ct. 494, 90 L.Ed. 614 (1946) (subpoena *duces tecum* issued by the Commissioner of the U.S. Department of Labor pursuing a pre-charge investigation pursuant to the Fair Labor Standards Act) ("The Fourth [Amendment], if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The *gist of the protection* is in the requirement ... that the disclosure sought *shall not be unreasonable.*") (emphases added); *Hale v. Henkel,* 201 U.S. 43, 73, 26 S.Ct. 370, 50 L.Ed. 652 (1906) (subpoena *duces tecum* issued by a grand jury investigating an alleged violation of the Anti–Trust Act) ("[T]he search and seizure clause of the Fourth Amendment was not intended to interfere with the power of courts to compel, through a

## III

Before we consider whether the trial court erred in denying Oman's motion to suppress the results of his post-accident test, we address the constitutionality of Michigan City's Ordinance and whether the results of Oman's administrative drug test can be used in a criminal prosecution against him. The Court of Appeals found that the use of such "government-compelled drug tests in criminal prosecutions" violated Oman's constitutional rights under the Fourth Amendment. *Oman*, 707 N.E.2d at 329. We disagree.

### A

As a matter of federal constitutional law, we find this case governed by principles enunciated by the United States Supreme Court in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and the companion case of *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).[19]

In both *Skinner* and *Von Raab*, the Supreme Court upheld the constitutionality of government testing programs – similar to Michigan City's Ordinance[20] – by recognizing that the effected employees were engaged in *safety-sensitive tasks*, so that "special needs" existed beyond normal law enforcement to justify a departure from the usual warrant and probable cause requirements of the Fourth Amendment.[21] *Von Raab*, 489 U.S. at 665–66, 109 S.Ct. 1384 (discussing *Skinner*). The Supreme Court, however, was careful to note the "administrative purpose" of both testing programs, neither of which "was designed as 'a "pretext" to enable law enforcement to gather evidence of penal law violations.'" *Skinner*, 489 U.S. at 621 n. 5, 109 S.Ct. 1402 (quoting *New York v. Burger*, 482 U.S. 691, 716–17 n. 27, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)); *see also Von Raab*, 489 U.S. at 666, 109 S.Ct. 1384 ("It is clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement.").

subpoena *duces tecum*, the production, upon a trial in court, of documentary evidence."), *overruled in part on other grounds, Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

19. In *Skinner*, the Court considered the constitutionality of Federal Railroad Administration regulations that required mandatory blood and urine tests for train crews involved in certain railway accidents. In *Von Raab*, the Court considered the constitutionality of a U.S. Customs Service drug screening program that required mandatory urinalysis for agents seeking transfer or promotion to drug interdiction positions or positions requiring the handling of firearms.

20. The Ordinance requires employees to undergo suspicionless, pre-employment testing, in addition to the type of suspicion-based, "reasonable cause" testing implicated in this case. Oman does not dispute that reasonable cause existed for Michigan City's request that he submit to a drug test after he was involved in "an accident" as the driver of one of two fire trucks that collided en route to a fire call.

21. Justice Kennedy explained in *Von Raab*:

As we note[d] in [*Skinner*], our cases establish that where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context. [*Skinner* 489 U.S. at 619–20, 109 S.Ct. 1402].

It is clear that the Customs Service's drug-testing program is not designed to serve the ordinary needs of law enforcement. Test results may not be used in a criminal prosecution of the employee without the employee's consent. The purposes of the program are to deter drug use among those eligible for promotion to sensitive positions within the Service and to prevent the promotion of drug users to those positions. These substantial interests, no less than the Government's concern for safe rail transportation at issue in [*Skinner*] present a special need that may justify departure from the ordinary warrant and probable-cause requirements.

*Von Raab*, 489 U.S. at 665–66, 109 S.Ct. 1384.

Here, Oman does not directly challenge the constitutionality of the Ordinance, nor does he claim that Michigan City has implemented it as a *pretext* for unearthing criminal behavior for use against city employees in future criminal trials.[22] Instead, Oman claims—and the Court of Appeals agreed—that as a matter of general Fourth Amendment law, the results of employer administrative drug tests can *never* be used as the basis of criminal investigations and trials, regardless of the circumstances or who is seeking the test results (law enforcement or the non-law-enforcement employer). However, neither the Supreme Court's decision in *Skinner* nor *Von Raab* prohibit such use. *See, e.g., Skinner*, 489 U.S. at 621 n. 5, 109 S.Ct. 1402 ("We leave for another day the question whether routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise

impugn the administrative nature of the FRA's program.").[23]

And while we acknowledge that the Supreme Court has left open the question of governmental *employers* using their administrative testing programs to pursue criminal drug use convictions against employees, *see id.*, the record does not establish that occurred in this case. Here, the *prosecutor* was pursuing a criminal investigation based upon: (1) the knowledge that two fire trucks, with lights and sirens on, had collided during a fire run, and (2) a tip that one of the drivers had tested positive on his post-accident drug test.

■ In light of the substantial authority establishing the constitutionality of administrative testing programs such as the Ordinance,[24] and in the absence of any authority which *per se* shields the results of constitutionally sound testing programs from valid compulsory legal process, we proceed to determine whether, on the facts

---

22. Our review of the Ordinance satisfies us that it not designed to serve the *"ordinary needs of law enforcement,"* which has other available means, including field sobriety tests, to gather evidence to prosecute individuals who choose to drive while impaired. *See, e.g.,* Ind.Code § 9–30–6–1 *et seq.* (Indiana's Implied Consent Law).

More to the point, the primary fear associated with administrative testing programs being used to serve "the ordinary needs of law enforcement" has little to do with accident-triggered toxicological testing. Instead, this fear is focused on the potential for law enforcement to obtain drug test results from pre-employment and random drug screening tests to prosecute individuals for illegal drug use. *See, e.g.,* Appellant's Br. at 13 ("Drug testing is now common in the work place, including the private sector[, so that] ... a prosecutor could subpoena any employee's drug testing records if he heard that an employee had tested positive."). As we explain, *infra* in Part IV–B (discussing relevancy to valid criminal investigations), use of an investigative subpoena in this way would be improper.

23. We observe that the Federal Railroad Administration testing regulations at issue in *Skinner* were *suspicionless* and very broad. They required *entire train crews* to submit to urinalysis and blood testing after a "major

train accident" or "impact incident." *Skinner*, 489 U.S. at 608–09 & n. 2, 109 S.Ct. 1402; *see also id.* at 635, 109 S.Ct. 1402 (Marshall, J., dissenting) ("[E]ntire railroad crews [must] submit to invasive blood and urine tests ...."); *id.* at 654, 109 S.Ct. 1402 ("Some corroborative evidence is needed: witness or co-worker accounts of a worker's misfeasance, or at least indications that the cause of the accident was within a worker's area of responsibility.").

By way of comparison, the particular Ordinance provision implicated in this case is *suspicion-based* and much narrower in scope, requiring toxicological testing only when the City has "reasonable cause" to suspect an employee because he or she was involved in "an accident which [was] caused by the apparent action or interaction of the employee under circumstances which indicated that the accident may [have been] the result of the use of drugs or alcohol." (R. at 70; Ordinance No. 3375). We note that both Oman and the driver of the other fire truck were tested as per this Ordinance.

24. In addition to the *Skinner* and *Von Raab* decisions, see *Miller v. Vanderburgh County*, 610 N.E.2d 858 (Ind.Ct.App.1993), *transfer denied*, where the Court of Appeals upheld, in dicta, the constitutionality of an administrative testing program similar to Michigan City's Ordinance.

of this case, the trial court was correct in not suppressing Oman's post-accident toxicological test results.

## B

In addition to the aforementioned general propositions, the trial judge also considered Oman's claims (1) that he "was compelled to undertake the drug and alcohol test in question as a condition of his continued employment," and (2) that the results of his drug and alcohol test were received by law enforcement authorities "in violation of the confidentiality provisions of the ordinance under which the test was compelled." (R. at 36–37; Order on Defendant's Motion to Suppress).

### B–1

 Oman's contention that he was "compelled to submit" to post-accident toxicological testing is simply without merit. Both in his brief, see Appellant's Br. at 12 (citing *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (Fifth Amendment case)), and at oral argument, Oman claimed he was "compelled" to choose between toxicological testing or maintaining his employment in violation of his constitutional right against self-incrimination. Toxicological samples, however, are simply not evidence of a testimonial or communicative nature protected by the Fifth Amendment. And it makes no difference whether law enforcement compelled the test results while pursuing a criminal investigation, see *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), or whether the governmental employer (i.e., non-law enforcement) compelled the test results as part of an administrative testing program,

see *Skinner*, 489 U.S. at 625, 109 S.Ct. 1402 (analyzing *Schmerber*).

Furthermore, Oman had agreed to submit to post-accident drug testing as a condition of his employment with Michigan City in a safety-sensitive job. If Oman had objected to this or any other provision prior to the accident, he could have sought employment elsewhere. If Oman had objected to the testing provision at the time of the accident, he could have refused his union president's directive to take the test and been subject to—as he readily acknowledged during the suppression hearing—an "[a]utomatic thirty day suspension with possible termination," (R. at 84), in lieu of the criminal prosecution he now faces. While these alternatives may have been unpleasant, they were alternatives; Oman was not compelled.

### B–2

 We also disagree with Oman's second contention that the results of his toxicological testing were received by law enforcement authorities in violation of the confidentiality provisions contained in the Ordinance. Oman's claim that he has a reasonable expectation of privacy arising from the confidentiality provisions is refuted by the plain language of the Ordinance, which clearly states: "Disclosure of test results . . . without the written authorization of the employee . . . shall not be made *except* when[ ] the information is *compelled by law* or by judicial and administrative process." (R. at 77) (emphasis added).[25] *Compare Skinner*, 489 U.S. at 621 n. 5, 109 S.Ct. 1402 (acknowledging that the test results obtained under the FRA regulations could " 'be made available to . . . a party in litigation upon service of appropri-

---

**25.** Just as we find no violation of the ordinance's confidentiality provisions in the laboratory's disclosure of the test results to the prosecutor, we also find no violation of those provisions in the mere fact that the police had received an anonymous tip that Oman had tested positively for marijuana. No evidence was presented that anyone bound by the ordi-

nance's confidentiality provisions was the source of the tip. In the absence of such evidence, we decline to rule on whether disclosure of the test results in violation of the ordinance's confidentiality provisions would entitle the person tested either to have the test results suppressed in a criminal proceeding or to some civil remedy against the tipster.

ate compulsory process on the custodian'") (quoting 49 CFR § 219.2101(d) (1987)).[26]

### B–3

The plain language of the Ordinance aside, the disclosure provision is not inconsistent with Oman's reasonable expectation of privacy under either federal or state law.[27]

### B–3–a

■■■ As a matter of federal law, an individual does have a privacy interest in his or her bodily fluids. *See Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (A person has an "individual interest in avoiding disclosure of personal matters."). Nevertheless, the right to keep employer-mandated test results private is not absolute. *See, e.g., Carrelli v. Ginsburg,* 956 F.2d 598, 607 (6th Cir.1992) (upholding the constitutionality of an (Ohio) state horse racing commission drug testing program and reversing the district court's ruling that the

commission violated an individual's privacy interest by repeatedly publicizing his positive test result for illegal drug use) ("Though the contours of constitutional confidentiality are murky, the positive test result, information contained in the urine, is not "private" in a constitutional sense.") (citing *Scheetz v. The Morning Call, Inc.,* 946 F.2d 202, 207 n. 5 (3d Cir.1991)).[28]

Furthermore, there is a large body of decisional law in similar contexts documenting lawful disclosure of otherwise confidential information in third party records in the face of valid compulsory legal process. For example, with regard to an individual's reasonable expectation of privacy in his or her medical records, federal courts follow the Supreme Court's lead in *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and apply a balancing test, considering the potential conflict between the patient's right to privacy and the asserted right of access to the rec-

---

**26.** Pursuant to the Ordinance, "[n]o *record of a negative [test result] or unconfirmed positive test* result shall be maintained by the City or by the testing laboratory and a *record of a confirmed positive test* result shall be maintained only in the employee's confidential file." (R. at 77) (emphases added). In asking us to consider his reasonable expectation of privacy, Oman notes that "[t]he testing laboratory was not even supposed to keep the results." Appellant's Br. at 10. However, a third party (i.e., Michigan City) and not the employee maintains control over a file containing "a record of a confirmed positive test result." As such, we see no reason to differentiate between the lab's disclosure when "compelled by law" with that of the employer's disclosure when "compelled by law."

**27.** Due to the unique facts of this case and our resolution thereof, we need not directly decide whether an individual has a reasonable expectation of privacy in administrative drug test results. However, we note the diminished expectation of privacy in analogous forms of otherwise confidential information to satisfy our concern that Oman's Fourth Amendment rights have not been violated.

**28.** While most federal decisions analyze disclosure of test results to the public at large, there is at least one case currently pending

before the U.S. Supreme Court involving a drug testing program where a hospital directly forwarded the toxicological test results to law enforcement officials. *See Ferguson v. City of Charleston, S.C.,* 186 F.3d 469, 483 (4th Cir.1999) (finding the testing policy constitutional in light of the state's "compelling interest in the identification of law breakers and in deterring future misconduct"), *cert. granted,* —— U.S. ——, 120 S.Ct. 1239, 146 L.Ed.2d 98 (2000).

In *Ferguson,* the Fourth Circuit upheld a hospital's administrative testing program, specifically targeting pregnant mothers suspected of using cocaine. The suspicion-based policy tested the urine of pregnant woman and then *affirmatively* released the positive test result and medical records to the local prosecutor, who in turn presented the offending woman with a "choice between being arrested [or] receiving drug treatment." *Id.* The hospital's policy "was not to arrest patients but to facilitate their treatment and protect both mother and unborn child." *Id.* 186 F.3d at 475 n. 3 (internal quotations omitted). In dissent, Judge Blake noted that the "consent forms signed by the plaintiffs did not advise them that their drug test results would be disclosed to the police," and the testing program "resulted in the arrest of nine of the 10 plaintiffs." *Id.* at 484, 486 (Blake, District Judge, dissenting in part).

ords.[29] With respect to confidential information contained in bank records, an individual's reasonable expectation of privacy is also diminished when those records are compelled by "normal legal process." *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 54 & n. 24, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) ("[I]t is difficult to see how the summoning of a third party, and the records of a third party, can violate the rights of [a] taxpayer, even if a criminal prosecution is contemplated or in progress.") (internal quotations omitted), *aff'g in part and rev'g in part Stark v. Connally*, 347 F.Supp. 1242 (N.D.Cal.1972).[30]

### B–3–b

■■■ As a matter of state law, we have not previously considered an individual's privacy interest in toxicological test results under the Indiana Constitution, and we decline to do so today. We do note, however, that a person who operates a vehicle in Indiana impliedly consents to submit to toxicological testing as a condition of operating that vehicle. *See* Ind.Code § 9–30–6–1 (1993). While the facts of this case do not directly implicate Indiana's Implied Consent Law, the disclosure requirements contained therein are instructive in that, as a Hoosier driver, Oman should have little or no expectation of privacy in a post-accident test result that indicates the presence of marijuana. *Cf. Burp v. State*, 612 N.E.2d 169, 173 (Ind.Ct.App.1993) (The disclosure provision of Indiana's Implied Consent Law, Ind.Code § 9–30–6–6, "does not create any rights in a criminal defendant but rather limits his right to invoke a privilege."); *Hurt v. State*, 553 N.E.2d

1243, 1246 (Ind.Ct.App.1990) (For purposes of Ind.Code § 9–30–6–6, "the legislature has abolished the physician-patient privilege.").

Furthermore, Hoosiers enjoy only a limited expectation of privacy in similar contexts, such as banking records, when law enforcement seeks information contained therein as part of a valid criminal investigation. *See Indiana Nat'l Bank v. Chapman*, 482 N.E.2d 474, 478–79 (Ind.Ct.App. 1985) (holding that where a bank provided answers to an investigating officer's questions about the defendant's automobile loan, the "[b]ank's communication ... was not a 'publicizing of one's private affairs with which the public has no legitimate concern,'" so as not to "give rise to a private right of action for invasion of privacy") (quoting *Continental Optical Co. v. Reed*, 119 Ind.App. 643, 86 N.E.2d 306, 308 (1949)), *reh'g denied*.

### C

■■■ In summary, we find that: (1) absent evidence to the contrary, Michigan City's Ordinance is constitutionally sound and typical of those government drug testing programs approved by the U.S. Supreme Court under its "special needs" exception to its Fourth Amendment doctrine; (2) the Ordinance disclosure provision implicated in this case is not inconsistent with Oman's reasonable expectation of privacy under either federal or state law; and (3) the results of Oman's administrative drug test can be used in a criminal prosecution against him, but only if obtained by

---

**29.** *See, e.g., United States v. Jenkins*, 895 F.Supp. 1389, 1393 (D.Hawai'i 1995) ("While the right to keep medical records is not absolute, it is an important consideration to be weighed in reviewing such *subpoenas*.") (emphasis added) (citation omitted); *Mann v. University of Cincinnati*, 824 F.Supp. 1190, 1197 (S.D.Ohio 1993) ("[T]he University, through its counsel, should have been aware that it was not free to disclose medical records, even to other University departments or to their attorneys, in the absence of a release

by the patient or a *valid court order*.") (emphasis added).

**30.** *See generally* Michael Kurt Guest, Note, Stark v. Connally: *Defining the Bank Customer's Right of Privacy*, 48 Ind. L.J. 649, 653 n.32 (1973) (reviewing various decisional and statutory pronouncements concerning federal banking law, which highlight the U.S. Supreme Court's general requirement that "some limitation[s be placed] on congressional power to require records" but that a proper limitation satisfying the "reasonableness"

valid legal process externally initiated from the employment setting. As such, we proceed to determine whether the Michigan City prosecutor obtained Oman's test results by valid legal process.

## IV

### A

 Indiana prosecutors are statutorily empowered to investigate criminal activity without the aid of a grand jury and may issue subpoenas to gather both testimonial and documentary evidence. *See* Ind.Code § 34–14–1–3 (1993). This investigative authority includes the ability to gather documentary evidence maintained by a third party, provided that a trial judge or magistrate first determines the subpoena is reasonable under the Fourth Amendment. A reasonable investigative subpoena *duces tecum* is one that is (1) sufficiently limited in scope, (2) relevant in purpose, and (3) specific in directive so that compliance will not be unreasonably burdensome. *See Pollard,* 263 Ind. at 254, 329 N.E.2d at 586 (quoting *City of Seattle,* 387 U.S. at 544, 87 S.Ct. 1737). Applying this standard, we find the investigative subpoena *duces tecum* issued in this case was reasonable under the Fourth Amendment.[31]

### B

Acting on the knowledge that two fire trucks had collided during a fire run and a tip that one of the drivers had tested positive for marijuana use during his employer-mandated post-accident drug test, the deputy prosecutor in this case issued an investigative subpoena *duces tecum,* directing the Records Keeper of the NIMLS laboratory to produce the following: "Blood and/or urine test results of Firefighter Ron Oman, Sr., taken on or about April 28, 1998, taken to determine content of alcohol or controlled substances." (R. at 61; Defendant's Ex. B.)

First, the subpoena was *sufficiently limited in scope* in that the deputy prosecutor only requested Oman's test results and not those of the other driver tested about which the prosecutor had received no additional information. Second, it is *specific in directive* so as not to be unduly burdensome in that the prosecutor only sought production of the April 28th test results and not other results possibly maintained by the lab.

Finally, the subpoena was relevant *in purpose* to a *valid criminal investigation.* We acknowledge Oman's concern that, absent proper safeguards, a prosecutor could conceivably "subpoena any employee's drug testing records if he heard that an employee had tested positive." Appellant's Br. at 13. But there is a fundamental difference between Oman's hypothetical and the actual case before us today.

In the hypothetical, an employee's positive test result forms the *initial evidentiary basis* for charging an individual for illegal drug use. In such a situation, the prosecutor's subpoena would not relate to a *valid* criminal investigation. This is because the employer's testing program would produce the sole relevant initial evidence of criminal conduct. Such a use of a drug test would serve "the ordinary needs of law enforcement" in a manner disapproved of in *Skinner* and *Von Raab.*[32]

But Oman's positive test result *did not* form the *initial evidentiary basis* for charging him: Oman was, first and foremost, the driver of one of two fire trucks involved in an accident. This accident was

standard is the valid legal process necessarily surrounding the issuance of a subpoena).

**31.** Consistent with the rule of law we enunciate today, *see supra* Part I–B, a trial judge or magistrate must review the subpoena *duces tecum* to ensure that it is reasonable.

**32.** We should note the subtle, but important, distinction between our discussion here, ad-

dressing a *valid* criminal investigation, and our discussion set forth in Part III–A, *supra,* discussing a *valid* or reasonable employer administrative drug testing program as one not used as a pretext for unearthing criminal behavior for use against employees by the employer.

documented in two different reports—a police report and an Indiana crash report—that formed the requisite initial evidentiary basis for the prosecutor's legitimate inquiry into a possible DUI offense.[33]

■■■ To reiterate: A prosecutor's subpoena *duces tecum* issued to a third party for the production of an employer-mandated drug test result is not relevant in purpose to a *valid criminal investigation* if the employee's positive test result forms the *initial evidentiary basis* for charging an individual with the commission of a crime. Applying this rule in this case, we find the subpoena was relevant in purpose to a valid criminal investigation.

Notwithstanding that a judge or magistrate did not review the subpoena prior to its issuance as per the rule we enunciate today,[34] we find the investigative subpoena *duces tecum* was reasonable under the Fourth Amendment, and that the trial court did not err in denying Oman's motion to suppress his drug test results.

### Conclusion

In summary, we conclude that: (1) a prosecutor acting without a grand jury must *seek leave of court* before issuing a subpoena *duces tecum* for the production of documentary evidence maintained by a third party; (2) the trial judge or magistrate will review this subpoena for reasonableness using the three-factor *City of Seattle* test; (3) government drug testing programs such as Michigan City's Ordinance are constitutionally justified under the U.S. Supreme Court's "special needs" exception to its Fourth Amendment doctrine; (4) Oman was not compelled to submit to toxicological testing in violation of his Fifth Amendment rights; (5) the Ordinance disclosure provision implicated in this case is not inconsistent with Oman's reasonable expectation of privacy under federal or state constitutional law; (6) toxi-

cological test results from an employer administrative drug test are admissible in a criminal proceeding but only if obtained by valid legal process externally initiated from the employment setting; and (7) the deputy prosecutor in this case reasonably obtained Oman's test results by valid legal process in that the subpoena *duces tecum* was sufficiently limited in scope, specific in directive, and relevant in purpose to a valid criminal investigation, where the employee's positive test result did not form *the initial evidentiary basis* for charging the individual for the offense of driving while intoxicated.

We therefore grant transfer, vacate the opinion of the Court of Appeals, and remand to the trial court for further proceedings consistent with this opinion.

SHEPARD, C.J., and RUCKER, J., concur.

BOEHM, J., concurs in result with separate opinion in which DICKSON, J., concurs.

BOEHM, Justice, concurring in result.

I agree with the majority's result, but not with all of its reasoning. First, the majority notes that older cases seem rather clearly to assume, if not to hold, that an investigatory subpoena may be issued without court approval. The majority distinguishes these cases on the ground that they deal with subpoenas to testify, not with subpoenas requiring the production of physical evidence. I see no material difference between the two for purposes of determining whether a court's approval is required before a citizen can be haled before the grand jury. It seems to me that the new rule this Court announces today in the exercise of its supervisory powers is inconsistent with these precedents, and that we should acknowledge that conflict

---

**33.** The police report conspicuously identified only one driver, Oman, as "appear[ing] tired [ ] as if he had just woke up from sleep[ ]." (R. at 10.) Viewing matters favorably to the non-movant, we have no reason to believe that the deputy prosecutor did not consider both of these reports during his investigation.

**34.** *See supra* Part I–B and note 10.

and recognize that these older cases are disapproved.

Second, I do not believe it is fair to say that there is no evidence to suggest a breach of the confidentiality policy by whoever alerted the assistant chief of police to the positive result of Oman's test. Several factors suggest that the tipster was someone who administered the test, received the report pursuant to the confidentiality policy, or got the information from someone who did. The evidence here is not that some anonymous caller told the police to look into Oman's test. Nor is it that someone claimed that at or near the time of the accident Oman looked suspiciously like someone who had used a controlled substance. Either could easily have come from someone who observed Oman. Instead, the evidence is that the day after the accident, the assistant chief of police "heard" that Oman had tested positive, not just that there was a probability he might test positive. The fact that the information was passed on to the police so soon after the test, perhaps before Oman himself was informed of the results, strongly suggests that a person bound by the confidentiality policy was the unnamed tipster.

There is apparently no constitutional requirement that confidentiality be a component of a drug testing program to validate it against Fourth and Fourteenth Amendment challenges. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). Nonetheless, simple notions of fairness suggest that where an employer guarantees confidentiality and then breaks that promise, there is something wrong with using positive results to prosecute an employee. The issue here, however, is whether a breach of the confidentiality policy warrants suppression of the evidence in a criminal proceeding. In my view, other remedies, including disciplinary action against the source of the breach, should be sufficient to validate the policy. The exclusionary rule proposed by Oman is simply more than is required by the Constitution or by policy considerations to accomplish that goal. Accordingly, I concur in the result reached by the majority.

DICKSON, J., concurs.