STATE of Indiana, Appellant–Plaintiff,

v.

Ali EICHHORST, Appellee–Defendant.

No. 28A01–0707–CR–310.

Court of Appeals of Indiana.

Jan. 30, 2008.

Rehearing Denied April 3, 2008.

---

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

J.J. Paul, III, John D. Fierek, Voyles Zahn Paul Hogan & Merriman, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

The State of Indiana appeals the trial court's grant of a motion to suppress filed by Ali Eichhorst. The State raises one issue, which we restate as whether the trial court abused its discretion by granting Eichhorst's motion to suppress the results of the hospital's blood alcohol tests, which were obtained by the State pursuant to an investigatory subpoena duces tecum. We reverse and remand.

The relevant facts follow. In the early morning hours of April 15, 2006, Eichhorst was driving a vehicle with her younger sister, Tara Eichhorst, as a passenger. Eichhorst's vehicle was involved in a one-car accident, and Tara died as a result of her injuries from the accident. Eichhorst was ejected from the inverted vehicle, and her arm was pinned underneath it. Greene County Sheriff's Deputy Jeremy Inman was dispatched to the scene of the accident. When he arrived, the ambulance was already there, and medical personnel were treating Eichhorst. Eichhorst was secured by a backboard and cervical collar and transported to the Greene County General Hospital ("Hospital"). Deputy Inman did not approach Eichhorst while the medical personnel were treating her. Deputy Inman did ask another officer to "go by the hospital" and ask for a blood draw from Eichhorst. Transcript at 27.

At the Hospital, Eichhorst was examined by Dr. Bud McDougal. According to Dr. McDougal, when Eichhorst arrived, "she was very loud and calling out[,] uncooperative and acted like she didn't know where she was and had a very strong smell of ethanol on her." *Id.* at 8. Dr. McDougal examined Eichhorst, ordered laboratory tests, and ordered x-rays. Dr. McDougal ordered blood tests to determine if she was bleeding, determine her electrolyte balance, and her alcohol level to "be able to treat her in the best possible way." *Id.* Dr. McDougal also noted that intoxication may impair a patient's ability to describe pain and impair a patient's ability to consent to treatment. Dr. McDougal recorded his orders, including the blood alcohol level test, on a Physician Order Sheet. State's Exhibit 5.

Someone also informed Nurse Diane Brown that a police officer had called and requested a blood draw. Nurse Brown drew the blood for the Hospital's tests and also drew a vial of blood for the police. She recorded in the chart that she had drawn blood for police evidence. The blood test revealed that Eichhorst had a blood alcohol level of 0.276.

Shortly thereafter, Deputy Inman went to the Hospital and obtained the vial of blood from Nurse Brown. According to Deputy Inman, Nurse Brown informed him that he could not talk to Eichhorst at that time, that Eichhorst smelled like alcohol, and that Eichhorst said she had been drinking. In her later deposition testimony, Nurse Brown denied making these statements to Deputy Inman, but testified that Eichhorst did smell of alcohol.

On April 18, 2006, the State filed a Motion for Issuance of a Subpoena Duces Tecum to the Greene County General Hospital for Eichhorst's medical records for April 15, 2006. In support of the motion, the State alleged that:

1. On April 15, 2006, [ ] Eichhorst was the driver of a vehicle involved in an accident.

2. [ ] Eichhorst was treated at Greene County General Hospital on or about April 15,2006.

3. The law enforcement officer who investigated the accident has reasons to believe that [ ] Eichhorst had been consuming alcoholic beverages prior to the accident.

4. The hospital records requested relate to a determination of whether [ ] Eichhorst Operated a Vehicle While Intoxicated.

5. Such information is needed by the Deputy Prosecuting Attorney for the 63rd Judicial Circuit to carry out his duties to prosecute.

State's Exhibit 1. The trial court granted the State's motion for a subpoena duces tecum, and on April 19, 2006, the Greene County Clerk of the Courts issued the subpoena duces tecum and ordered the Greene County General Hospital to produce: "Any and all medical records (including test for blood alcohol level and drug screen) on Ali Eichhorst ... treated on or about April 15, 2006." State's Exhibit 2. The Greene County General Hospital complied with the subpoena duces tecum and produced Eichhorst's medical records, including the blood alcohol test. State's Exhibit 3.

On May 3, 2006, the State then charged Eichhorst with operating a vehicle while intoxicated causing death, a class C felony,[1] and operating a vehicle with an alcohol concentration equivalent to at least .08 gram of alcohol but less than .15 gram of alcohol in blood or breath resulting in death, a class C felony.[2] Eichhorst filed a motion to suppress the blood alcohol test results processed by both the police and the Hospital. The State conceded that the results of the blood draw provided to the police were inadmissible because Deputy Inman did not have probable cause at that time to believe Eichhorst was intoxicated. As for the medical records obtained from the Hospital pursuant to the subpoena duces tecum, Eichhorst argued that: (1) she did not consent to the treatment; (2) the blood draw was not necessary for medical treatment purposes; (3) the subpoena duces tecum was overly broad in scope; and (4) her rights under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104–191; 42 U.S.C. § 1320d, were violated by the release of her medical records pursuant to the subpoena duces tecum. The State responded by arguing that: (1) the subpoena duces tecum was reasonable and complied with HIPAA; (2) the treatment was medically necessary; (3) Eichhorst was incapable of giving an informed consent due to her intoxication; and (4) Eichhorst's consent was irrelevant because the evidence was obtained pursuant to a subpoena duces tecum. After an evidentiary hearing, the trial court granted Eichhorst's motion to suppress the blood draws and the test results of the blood draws.

The issue is whether the trial court abused its discretion by granting Eichhorst's motion to suppress the results of the hospital's blood alcohol tests, which were obtained by the State pursuant to an investigatory subpoena duces tecum. When appealing from a trial court's order granting a motion to suppress, the State

---

1. Ind.Code § 9–30–5–5(a)(3) (Supp.2005).

2. Ind.Code § 9–30–5–5(a)(1)(A) (Supp.2005).

has the burden to demonstrate the constitutionality of the measures it used to secure information. *State v. Harris,* 702 N.E.2d 722, 726 (Ind.Ct.App.1998). It is therefore appealing from a negative judgment. *Id.* This court will reverse a negative judgment only when the evidence is without conflict and all reasonable inferences lead to a conclusion opposite that reached by the trial court. *Id.* We will consider only the evidence most favorable to the judgment and will not reweigh the evidence or judge the credibility of the witnesses. *Id.*

The State argues that the trial court abused its discretion by suppressing the Hospital blood draw because the test was performed for medical purposes, Eichhorst's consent was unnecessary due to her intoxication, and the State obtained the test results pursuant to a proper subpoena duces tecum. Eichhorst responds that she had a reasonable expectation of privacy in her medical records under HIPAA, the subpoena duces tecum was improper, her "protected health information" was used to obtain the subpoena duces tecum, she did not consent to the Hospital's treatment, and the blood draw was not medically necessary.

We begin by emphasizing that this appeal concerns only the results of the Hospital's blood test because the State conceded in the trial court that Officer Inman did not have probable cause to request a blood draw for the police. *See generally Hannoy v. State,* 789 N.E.2d 977 (Ind.Ct. App.2003) (discussing police blood draws under Ind.Code § 9–30–6–6(g)), *reh'g granted by* 793 N.E.2d 1109 (Ind.Ct.App. 2003), *trans. denied; Abney v. State,* 811 N.E.2d 415, 422 (Ind.Ct.App.2004), *adopted by* 821 N.E.2d 375 (Ind.2005).

 As for the hospital records, the State contends that the records were admissible under Ind.Code § 9–30–6–6(a), which provides:

A physician or a person trained in obtaining bodily substance samples and acting under the direction of or under a protocol prepared by a physician, who:

(1) obtains a blood, urine, or other bodily substance sample from a person, regardless of whether the sample is taken for diagnostic purposes or at the request of a law enforcement officer under this section; or

(2) performs a chemical test on blood, urine, or other bodily substance obtained from a person;

shall deliver the sample or disclose the results of the test to a law enforcement officer who requests the sample or results as a part of a criminal investigation. Samples and test results shall be provided to a law enforcement officer even if the person has not consented to or otherwise authorized their release.

"By its language, this section applies when a sample has already been obtained. It allows a police officer to obtain the sample or the results from the analysis of a sample that has already been collected when the results are needed as part of a criminal investigation." *Shepherd v. State,* 690 N.E.2d 318, 328 (Ind.Ct.App.1997), *trans. denied; see also Hannoy,* 789 N.E.2d at 990–992.

We addressed the constitutionality of this statute in *Hannoy,* 789 N.E.2d at 990–991, where we analyzed whether a police officer properly obtained a driver's hospital medical records. We considered whether obtaining the records was reasonable under the Fourth Amendment, and, specifically, whether the driver had a reasonable expectation of privacy in the records. 789 N.E.2d at 991. In determining whether the driver had a reasonable expectation of privacy, we looked at several factors, including the fact that driver consented to the medical treatment, the treatment was medically necessary, the police

were not involved in the taking or testing of the blood sample, and drivers should have little or no expectation of privacy in a post-accident test that indicates the presence of drugs or alcohol. *Id.* at 991–992.

We held: "To the extent [a defendant] does have an expectation of privacy in his medical records generally, we conclude that in Indiana at least, society does not recognize a reasonable expectation of privacy in blood alcohol test results obtained and recorded by a hospital as part of its consensual treatment of a patient, where those results are requested by law enforcement for law enforcement purposes only in the investigation of an automobile accident." *Id.* at 991. We concluded that the police may "acquire test results that medical personnel have obtained during the normal course of treatment."[3] *Id.* at 992.

Despite Ind.Code § 9–30–6–6(a) and *Hannoy*, Eichhorst argues that law enforcement could not obtain her medical records. Specifically, Eichhorst argues that: (A) she did not consent to the treatment and the treatment was not medically necessary; and (B) *Hannoy* is no longer valid due to the implementation of HIPAA. We will address each argument separately.

### A. *Hannoy factors.*

Eichhorst argues that her medical records should be suppressed based upon *Hannoy* because she did not consent to the treatment and the treatment was not medically necessary. *Hannoy* considered the patient's consent and whether the treat-

ment was medically necessary only in the context of determining whether the driver had a reasonable expectation of privacy in his hospital records.

We first address Eichhorst's consent to treatment. Eichhorst contends that when she "arrived at the hospital she should have been released without admission for refusing medical care." Appellee's Brief at 25. Eichhorst testified that she refused treatment from both the ambulance personnel and the emergency room personnel because she wanted to know where her sister was. In support of her argument, she cites deposition testimony of the emergency room nurses and the ambulance personnel that she was responding to questions and refusing treatment. However, Dr. McDougal testified that when Eichhorst arrived, "she was very loud and calling out[,] uncooperative and acted like she didn't know where she was and had a very strong smell of ethanol on her." Transcript at 8. Dr. McDougal was aware that Eichhorst had been involved in a serious accident in which she was ejected from the vehicle. He noted that intoxication may impair a patient's ability to consent to treatment. Dr. McDougal testified that Eichhorst was too intoxicated to "give an informed consent" to treatment. The emergency room nurses also testified that Eichhorst smelled of alcohol, was uncooperative, and screaming for her sister. State's Exhibit 7 at 12; State's Exhibit 9 at 15; State's Exhibit 10 at 6–7.

---

**3.** We emphasized that Ind.Code § 9–30–6–6 did not authorize "broad 'fishing expeditions' by law enforcement searching for evidence that some person has committed some crime." *Hannoy*, 789 N.E.2d at 992.

First, the placement of Section 9–30–6–6 in the Traffic Code clearly indicates that it applies only to criminal investigations concerning operating while intoxicated and its related crimes. Second, Hannoy was one of two drivers involved in a fatal motor vehicle accident, and we assume that law enforcement officers will limit their requests for toxicological test results specifically to drivers who have been hospitalized following an accident rather than requesting test results from patients at random for no reason whatsoever. This makes the request reasonable under the Fourth Amendment.

*Id.*

■ Consent to health care treatment is not required in an emergency or when the patient is too intoxicated to give consent. *See* Ind.Code § 34–18–12–9 (providing that consent is not required if the patient is "mentally incapable of understanding the information" regarding the proposed treatment, outcome, and risks and that consent to health care is not required in an emergency). As the State noted in its brief to the trial court, "[n]ot treating intoxicated patients who say they are 'just fine' in emergency situations would put physicians in a quandary. If a physician accepts the patient's refusal, the physician runs the risk of incurring malpractice liability for failing to provide necessary treatment." Appellant's Appendix at 102. Eichhorst's refusal of treatment is simply not relevant in determining whether she was too intoxicated to consent. Eichhorst's consent to treatment was not necessary because of the emergency situation and her intoxication.

■ Next, we address whether the blood test was medically necessary. When Eichhorst arrived at the Hospital, Dr. McDougal was aware that she had been ejected from the vehicle. He examined Eichhorst, ordered laboratory tests, and ordered x-rays. Dr. McDougal ordered blood tests to determine if she was bleeding internally, determine her electrolyte balance, and her alcohol level to "be able to treat her in the best possible way." Transcript at 8. Dr. McDougal recorded his orders, including the blood alcohol level test, on a Physician Order Sheet. State's Exhibit 5. He also noted that intoxication may impair a patient's ability to describe pain. In fact, Eichhorst did not complain of pain for several hours even though she had a fractured ankle.

Although Eichhorst's injuries were ultimately determined to be minor, the ambulance personnel and emergency room personnel were not aware of that at the time they examined her. Eichhorst essentially requests that the courts play armchair quarterback to the medical personnel's decision to examine and treat her. We decline Eichhorst's invitation. The blood test was medically necessary.

Finally, Eichhorst also implies that the blood test was done solely to serve the needs of law enforcement in its investigations. *See Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (invalidating a program operated by a state hospital, in conjunction with law enforcement, to test pregnant women for cocaine use without suspicion or their consent, where the program was operated for the law enforcement purpose of prosecuting women who tested positive); *Hannoy,* 789 N.E.2d at 990–991. We must disagree. The State presented evidence that Dr. McDougal ordered the blood test. Dr. McDougal recorded his orders, including the blood alcohol level test, on a Physician Order Sheet shortly after he saw her. Transcript at 10; State's Exhibit 5. The police officers did not ask him to draw Eichhorst's blood. State's Exhibit 6 at 25.

■ In summary, we conclude that Eichhorst's consent to the blood draw was not necessary and the blood draw was medically necessary. Further, the blood draw was not performed solely to serve the needs of law enforcement. We conclude that Eichhorst did not have a reasonable expectation of privacy in the medical records under *Hannoy.*

### B. HIPAA.

Eichhorst also argues that law enforcement may no longer rely upon Ind.Code § 9–30–6–6 and *Hannoy* to obtain such medical records without judicial process. Eichhorst points out that Ind.Code § 9–30–6–6 predates the implementation of HIPAA on April 14, 2003. Eichhorst contends that the subpoena used to obtain her

medical records did not comply with HIPAA.

In general, HIPAA requires that "covered entities" obtain patient authorization before disclosing protected health information, see 45 C.F.R. § 164.508(a), but exceptions apply. For example, "covered entities," which include "health care provider[s] who transmit[ ] any health information in electronic form," 45 C.F.R. § 160.103, may disclose protected information without patient authorization "for a law enforcement purpose to a law enforcement official" if certain conditions are met. 45 C.F.R. § 164.512(f). Specifically, 45 C.F.R. § 164.512(f)(1) provides that a covered entity may disclose protected health information "[i]n compliance with and as limited by the relevant requirements of: (A) A court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer." In general, "[a] standard, requirement, or implementation specification adopted under this subchapter that is contrary to a provision of State law preempts the provision of State law." 45 C.F.R. § 160.203.[4]

It is undisputed that Eichhorst's medical records were provided to the prosecutor pursuant to a subpoena duces tecum issued by a judicial officer as required by HIPAA. However, Eichhorst argues that the subpoena was improper based on *Oman v. State*, 737 N.E.2d 1131 (Ind.2000), *reh'g denied, cert. denied*, 534 U.S. 814, 122 S.Ct. 38, 151 L.Ed.2d 12 (2001).

The Indiana Supreme Court engaged in a lengthy discussion of such investigatory subpoenas duces tecum in *Oman*. 737 N.E.2d at 1134. There, a firefighter was involved in an accident on duty and submitted to a drug test pursuant to an ordinance requiring employees to submit to urine tests and breath tests under certain circumstances. *Id.* The ordinance provided that the test results would not be disclosed without the employee's consent except when compelled by law or by judicial or administrative process. *Id.* After the accident, the police received a tip that Oman had tested positive for marijuana. *Id.* The State then issued a subpoena duces tecum to the testing lab. *Id.* The lab complied, and the State charged Oman with operating a vehicle with a controlled substance in his blood. Oman moved to suppress the test results, and the trial court denied the motion. *Id.* On appeal, this court reversed, but the Indiana Supreme Court granted transfer. *Id.*

The Indiana Supreme Court discussed the criteria for issuing and reviewing an investigatory subpoena. *Id.* at 1138. The court reaffirmed a reasonableness standard, rather than a probable cause standard, for such subpoenas, noting that "[t]he *greatest protection* which the fourth amendment affords a witness subject to a grand jury subpoena *duces tecum* is the requirement of *reasonableness....*" *Id.* at 1139 (quoting *State ex rel. Pollard v. Criminal Court of Marion County*, 263 Ind. 236, 254, 329 N.E.2d 573, 586 (1975)). "This standard of reasonableness incorporates appropriate constitutional safeguards designed to limit overzealous prosecutors and at the same time minimize judicial second-guessing that could unnecessarily bog down pre-charge investigations." *Id.* at 1141.

The court concluded that "a properly issued investigative subpoena—one that is

4. We note that Indiana already required an investigatory subpoena duces tecum for such hospital records to be authorized by a court. *See Oman v. State*, 737 N.E.2d 1131, 1138 (Ind.2000), *reh'g denied, cert. denied*, 534 U.S. 814, 122 S.Ct. 38, 151 L.Ed.2d 12 (2001) (holding that, in the future, "[a] prosecutor acting without a grand jury must first seek leave of court before issuing a subpoena duces tecum to a third party for the production of documentary evidence").

reasonable under the Fourth Amendment-must only be: (1) relevant in purpose; (2) sufficiently limited in scope, and (3) specific in directive so that compliance will not be unreasonably burdensome." *Id.* At this point, the court also recognized in a footnote that "anonymous information in the form of a telephone tip lacks sufficient indicia of reliability to justify, for example, a *Terry* stop and frisk. However, to the extent that the Court of Appeals in this case engaged in weighing the sufficiency, reliability, or veracity of the 'information' justifying the issuance of a subpoena, it was wrong to do so." *Id.* at 1141 n. 18 (internal citations omitted).

The court then addressed the ordinance's testing program, which it concluded was constitutional. *Id.* at 1143. The court also disagreed with Oman's contention that the results of his toxicological testing were received by law enforcement authorities in violation of the confidentiality provisions contained in the ordinance because the results were disclosed pursuant to a subpoena, which was allowed by the ordinance. *Id.* at 1144–1145. As for the initial tip that led to the investigation, the court found:

> no violation of those provisions in the mere fact that the police had received an anonymous tip that Oman had tested positively for marijuana. No evidence was presented that anyone bound by the ordinance's confidentiality provisions was the source of the tip. In the absence of such evidence, we decline to rule on whether disclosure of the test results in violation of the ordinance's confidentiality provisions would entitle the person tested either to have the test results suppressed in a criminal proceeding or to some civil remedy against the tipster.

*Id.* at 1144 n. 25.

The court also addressed Oman's expectation of privacy notwithstanding the dis-closure provisions of the ordinance. The court noted that a person has a privacy interest in her bodily fluids. *Id.* at 1145. However, an individual's reasonable expectation of privacy is diminished in the "face of valid compulsory legal process." *Id.* Moreover, "a person who operates a vehicle in Indiana impliedly consents to submit to toxicological testing as a condition of operating that vehicle." *Id.* at 1146 (citing Ind.Code § 9–30–6–1). The court concluded that, "as a Hoosier driver, Oman should have little or no expectation of privacy in a post-accident test result that indicates the presence of marijuana." *Id.*

Lastly, the court addressed whether the State obtained the test results by "valid legal process." *Id.* at 1147. The subpoena at issue directed the "Records Keeper of the NIMLS laboratory to produce the following: 'Blood and/or urine test results of Firefighter Ron Oman, Sr., taken on or about April 28, 1998, taken to determine content of alcohol or controlled substances.' " *Id.* The court concluded that the subpoena was "sufficiently limited in scope" and "specific in directive." *Id.* The court also concluded that the subpoena "was relevant in purpose to a valid criminal investigation." *Id.* In so concluding, the court noted Oman's concern that the State could subpoena any employee's drug testing records if the prosecutor heard that the employee had tested positive. *Id.* The court held:

> In the hypothetical, an employee's positive test result forms the initial evidentiary basis for charging an individual for illegal drug use. In such a situation, the prosecutor's subpoena would not relate to a valid criminal investigation. This is because the employer's testing program would produce the sole relevant initial evidence of criminal conduct. Such a use of a drug test would serve "the ordinary needs of law enforcement"

in a manner disapproved of in *Skinner* and *Von Raab*.

But Oman's positive test result did not form the initial evidentiary basis for charging him: Oman was, first and foremost, the driver of one of two fire trucks involved in an accident. This accident was documented in two different reports—a police report and an Indiana crash report—that formed the requisite initial evidentiary basis for the prosecutor's legitimate inquiry into a possible DUI offense.

*Id.* at 1147–1148 (footnotes omitted).

Following *Oman,* the Indiana Supreme Court also decided *Forbes v. State,* 810 N.E.2d 681 (Ind.2004). There, after a fatal one-car accident, the defendant was transported from Indiana to a Kentucky hospital. 810 N.E.2d at 682–683. The State obtained the defendant's Kentucky hospital records through two subpoenas. *Id.* at 683. On appeal, the court again noted that a subpoena is reasonable if it is: 1) sufficiently limited in scope, 2) relevant in purpose, and 3) specific in directive so that compliance will not be unreasonably burdensome. *Id.* at 685. In discussing the subpoenas, the court held:

> Forbes contends that the first subpoena was not sufficiently limited because on its face it was not limited to blood alcohol tests and gave the troopers unbridled discretion as to the records to be taken. The subpoena served by the troopers sought "Medical Records of Darrell Lee Forbes, SSN [deleted], DOB [deleted]." There is no suggestion that Forbes had in fact been at the Louisville hospital on any prior occasion. However, at least theoretically, the subpoena could have called for Forbes's psychiatric records or other private information irrelevant to any pending charges. We agree that the subpoena was facially overbroad, but do not agree that the BAC test results must be sup-

pressed for that reason. Had the hospital or Forbes objected to the subpoena at the time Trooper Ashby served the subpoena, we would be faced with a different case. However, the hospital in supplying the information did not object to the breadth of the subpoena and Trooper Ashby in serving it asked for only the BAC test results. To the extent Forbes has a right to keep other medical information private, that right to privacy is not implicated here because no protected information was sought or obtained. To be sure, the request for "medical records" might have been quashed as "overbroad" if the issue were raised before the hospital complied. But because only BAC results were produced, no interest would be furthered by requiring the State to obtain a more specific subpoena duces tecum and repeat the drill. In any event, Forbes concedes that the subpoena from Clark County was sufficiently specific in its request for "Certified copies of any and all medical records showing result of Blood Alcohol Content Test performed on DARRELL LEE FORBES, DOB [deleted], SS # [deleted], for [sic] on September 10, 2000."

*Id.* at 685.

Lastly, the court addressed the defendant's argument that "the subpoena was defective because there was 'little or no evidence that alcohol was involved' in the accident, thus rendering the subpoena irrelevant." *Id.* The court disagreed with the defendant's contention, holding as follows:

> Trooper Ashby's affidavit establishing probable cause indicated that Forbes was driving at a high rate of speed and drove in a reckless manner. The officer noticed a stench of alcohol at the crash scene and alcoholic containers within plain view. Witnesses reported Forbes

throwing beer cans out the window. Given these circumstances, Trooper Ashby's actions were relevant to and were appropriate responses during the course of a reasonable investigation.

*Id.*

■ Here, the investigatory subpoena requested that the Hospital produce: "Any and all medical records (including test for blood alcohol level and drug screen) on Ali Eichhorst . . . treated on or about April 15, 2006." State's Exhibit 2. Eichhorst first seems to argue that the subpoena was not sufficiently limited in scope or specific in directive because more records than her blood alcohol test were requested. As the State notes, the prosecutor did not request all of Eichhorst's medical records, but rather just her medical records related to the date of the accident. The records would naturally contain the medical staff's observations of Eichhorst, which could be relevant in determining whether she was intoxicated at the time of the accident. As in *Oman* and *Forbes,* we conclude that the subpoena was sufficiently limited in scope and specific in directive. *See, e.g., Oman,* 737 N.E.2d at 1147–1148 (holding that a subpoena, which requested "Blood and/or urine test results of Firefighter Ron Oman, Sr., taken on or about April 28, 1998 . . .," was sufficiently limited in scope and specific in directive); *Forbes,* 810 N.E.2d at 685 (noting that the defendant conceded the subpoena was sufficiently specific in its request for "Certified copies of any and all medical records showing result of Blood Alcohol Content Test performed on DARRELL LEE FORBES, DOB [deleted], SS # [deleted], for [sic] on September 10, 2000").

The thrust of Eichhorst's argument relates to the "relevant in purpose" prong of the test announced in *Oman.* According to Deputy Inman, when he arrived at the Hospital, Nurse Brown told him that Eichhorst smelled of alcohol and that Eichhorst

admitted to drinking. In her deposition, Nurse Brown denied making these statements to Deputy Inman, although she did testify that Eichhorst smelled of alcohol. According to Eichhorst, the investigatory subpoena was not relevant in purpose because the investigation was based solely upon Nurse Brown's alleged statements to Deputy Inman, and those statements involved medical information protected by HIPAA.

Eichhorst is, in essence, arguing that the alleged information from Nurse Brown could not form the basis for a reasonable investigation because it was disclosed in violation of HIPAA. However, here, as in *Oman,* Nurse Brown's statements did not form the initial evidentiary basis for investigating Eichhorst. As in *Oman,* Eichhorst was, "first and foremost," the driver of a vehicle involved in an accident, and the accident "formed the requisite initial evidentiary basis for the prosecutor's legitimate inquiry into a possible DUI offense." *Oman,* 737 N.E.2d at 1147–1148.

■ Moreover, HIPAA provides for civil and criminal penalties for improper disclosures of medical information. *See* 42 U.S.C. § 1320d–5; 42 U.S.C. § 1320d–6. An individual who believes his rights under HIPAA have been violated may file a complaint with the Office of Civil Rights, Department of Health and Human Services, the federal agency that enforces the regulations. *See* 45 C.F.R. § 160.306. Eichhorst cites no authority for the proposition that evidence given in violation of HIPAA should be suppressed or excluded in a criminal setting. HIPAA does not contain such a remedy. *See State v. Downs,* 923 So.2d 726, 731 (La.Ct.App.2005) (noting that if "relator's complaint is that a HIPAA violation occurred, relator should file a complaint against the covered entity that disclosed the information"). We conclude that "HIPAA was passed to ensure an

individual's right to privacy over medical records, it was not intended to be a means for evading prosecution in criminal proceedings." *U.S. v. Zamora,* 408 F.Supp.2d 295 (S.D.Tex.2006). As a result, we conclude that Officer Inman was conducting a reasonable investigation and that the subpoena was "relevant in purpose."

In summary, we conclude that the subpoena duces tecum for Eichhorst's hospital records was reasonable. Consequently, we conclude that the trial court abused its discretion by granting Eichhorst's motion to suppress the Hospital's blood test results.

For the foregoing reasons, we reverse the trial court's grant of the motion to suppress and remand for proceedings consistent with this opinion.

Reversed and remanded.

RILEY and FRIEDLANDER, JJ., concur.